## W. T. RAWLEIGH CO. v. LAND et al. (No. 2876.)

(Court of Civil Appeals of Texas. Texarkana. March 14, 1924. Rehearing Granted May 1, 1924.)

1. **Monopolies** ⊜=17(2)—**Agreement restricting agent's sale to certain territory held to violate anti-trust statute; "combination."**

Where a company and dealer agreed that territory in which dealer was to sell his goods, bought from company, was to be restricted, and company also agreed not to sell goods to any other dealer in such territory, it constituted a "combination" to eliminate competition, violating the anti-trust statute.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Combination—Combine.]

2. **Monopolies** ⊜=21—**Principal contract rendered void if part of scheme to conduct business in unlawful manner.**

A principal contract to sell goods to a dealer was rendered void, though unlawful combination was not disclosed by its terms, if contract was a part of a covert scheme to conduct a business in an unlawful manner.

3. **Monopolies** ⊜=21—**Dealer's promise to pay for goods on illegal consideration held unenforceable.**

Where dealer's promise to pay a pre-existing debt for goods furnished him was based not only upon the consideration furnished by their value, but that seller would not sell similar goods to a competitor in his territory, his promise was tainted by the illegal agreement, and was unenforceable.

Appeal from District Court, Fannin County; C. A. Wheeler, Special Judge.

Action by the W. T. Rawleigh Company against B. B. Land and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Thos. P. Steger, of Bonham, for appellant. Cunningham, McMahon & Lipscomb, of Bonham, for appellees.

HODGES, J. The appellant is a foreign private corporation, with an office and place of business at Memphis, Tenn., and is engaged in selling, at wholesale, drugs, medicines, and other household articles of merchandise. In January, 1921, it entered into the following written contract or agreement with the appellee B. B. Land, as principal, and the other appellees as guarantors:

"Renewal Contract.

"(1) This contract, made and entered into at the city of Memphis, state of Tennessee, by and between the W. T. Rawleigh Company, an Illinois corporation, hereinafter called the seller, and B. B. Land of Gober, in the state of Texas, hereinafter called the buyer:

"(2) Witnesseth, whereas, said buyer desires to purchase of the seller, at wholesale, such of

its manufactured products as the seller shall hereafter determine to sell to the said buyer; the kind and quantity of which is to be optional with the said seller.

"(3) The seller agrees to sell and deliver to the buyer f. o. b. Memphis, Tennessee, or at its option f. o. b. Freeport, Illinois, or any of its branch houses, or at any other point agreed upon, such of its products as hereinabove specified, and at current wholesale prices, unless prevented by strikes, fires, accidents, or other causes beyond its control; the said buyer to furnish signed orders for such goods.

"(4) The buyer agrees to pay said seller the invoice price for all products so purchased under this agreement, also any balance due the seller at the date of the acceptance of this renewal contract, by cash, or by installment payments satisfactory to the seller, subject to the discounts as shown in current discount sheets, and subject to paragraph 6 hereof.

"(5) The seller will, at its option, also sell to the buyer a wagon, or a body suitable for auto chassis, for cash, or partly or wholly on time, such as the buyer may choose from the seller's current wagon catalogue, circulars, or other descriptions.

"(6) It is hereby further agreed that either party may, at any time before the expiration of this contract, by written notice, terminate this agreement, and when so terminated, the account then due and owing shall become immediately due and payable. If not so terminated, this agreement shall expire by limitation on the 31st day of December, 1921; and if buyer refuses or neglects to furnish acceptable renewal contract, the full amount due hereunder shall be due and payable promptly.

"(7) It is further agreed that if dealings conducted hereunder are mutually agreeable and satisfactory, that a new contract may be entered into for the succeeding year, but the refusal on the part of the seller to enter into a new agreement shall not in any wise affect the agreement herein on the part of the buyer to pay his account.

"(8) Seller agrees to purchase from buyer any products (wagon, auto body, and sample cases excepted) he may have on hand, and pay or credit buyer with the wholesale price current when they are received by seller, provided buyer returns them during the life of contract, or promptly after termination or expiration of same, and provided freight is fully prepaid to point seller designates said products are to be returned; buyer to pay seller the actual expense of inspecting and overhauling same.

"(9) It is mutually understood that the seller will furnish the buyer, from time to time, with educational salesmanship literature, consisting of Rawleigh's Weekly, Guide Book, and other booklets, bulletins, leaflets, and letters of advice and suggestions, for the sole purpose of aiding and assisting buyer in making sales and collections; but it is expressly agreed that nothing contained in any of the aforesaid literature, letters, booklets, bulletins, leaflets, etc., shall be taken in any wise to alter, modify, change, or affect this agreement, and shall only be considered as educational and advisory; and it is further expressly understood and agreed that any advice or suggestions contained therein is not to be considered by the buyer as orders, directions or instructions, nor in any way binding on him; it being mutually and fully understood and agreed that the said buyer is not, nor never has been, an agent or representative of the seller, but in business strictly for theirself.

"(10) And it is further understood and agreed, by and between the parties hereto, that this contract includes, and does and shall constitute, the sole, only, and entire agreement between the parties hereto; and further, that this contract cannot and shall not be changed or modified in any particular whatsoever by any employee or representative of the seller, in any capacity, unless any such change or modification shall first be specifically reduced to writing and signed by both of the parties hereto, and then any such change or modification shall only be effective after the corporate seal of the seller shall have been duly affixed thereto.

"(11) In witness whereof, the parties hereto have set their hands and seals, the seller in its corporate name, by its president thereunto duly authorized, and its corporate seal hereunto affixed, and the said buyer in his own proper person. The W. T. Rawleigh Company, by W. T. Rawleigh, President. [Signed] B. B. Land. [Seal.]

"Accepted Jan. 3, 1921, at Memphis, Tenn.

"For, and in consideration of, the sum of one dollar, to me in hand paid, the receipt of which is hereby expressly confessed and acknowledged, or in consideration of the above-named seller extending further credit to the said buyer, we, the undersigned, do hereby jointly and severally guarantee unto said the W. T. Rawleigh Company, the above-named seller, unconditionally, the payment, in full, of the balance due or owing said seller on account, as shown by its books at the date of the acceptance of this contract of guaranty by the seller; and the full and complete payment of all moneys due or owing, or that may become due or owing, said seller, and all indebtedness incurred by the buyer under the terms of the above and foregoing instrument, by the buyer named as such therein, and to all of the terms, provisions, and agreements contained in said instruments we fully assent and agree, hereby waiving notice of acceptance, by the seller, of this contract of guaranty, and all notice of any nature whatsoever, and agree that the written acknowledgment by said buyer of the amount due or owing on his account, or that any judgment rendered against him for moneys due the seller, shall in every and all respects bind, and be conclusive jointly or severally, against the undersigned. And we further agree that in any suit brought on this contract of guaranty by the seller, no other or further proof shall be required of it than to establish the amount or sum of money due and owing to it from the said buyer, and when so proven, shall be conclusive and binding upon the undersigned; and, further, that it shall not be necessary for said seller, in order to enforce this contract of guaranty, to first institute suit against said buyer nor exhaust its legal remedies against him; and agree that any extension of the time of payment or payments to said buyer shall not release us from liability, under this contract of guaranty.

"It is hereby mutually understood and agreed that this contract of guaranty is conclusive and binding on the party or parties who sign it, whether the same is signed by any other party, or parties, or not, and that any statement or

representation made by any person, as to the undertaking of the guarantor or guarantors other than as herein expressed, or as to who or how many parties are to sign this guaranty, shall in no wise affect the rights of the company; and it is mutually understood that this is to be a continuing guaranty; and any notice in any way affecting the responsibility or liability of the signers hereunto, in order to become effective and binding upon the above-named seller, shall be reduced to writing, and delivered by registered mail to the office of the said seller at Memphis, Tennessee. [Affix here 50c. war tax stamp.]

"Responsible Men Sign This Contract of Guaranty Below.

| Names. | | Occupations. | P. O. Addresses. |
|---|---|---|---|
| G. W. Skinner. | [Seal.] | Farmer. | Cash. |
| G. R. Boho. | [Seal.] | " | " |
| J. T. Graham | [Seal.] | " | " |

"The above guarantors are entitled, upon request at any time to a statement of buyer's account.

"If you expect prompt consideration of contract, guarantors should sign names plainly; also occupations and full addresses must appear plainly in the above spaces."

In April, 1922, the appellant filed this suit against Land and his guarantors to recover the sum of $2,444, as the balance due for merchandise sold to Land prior to, and after, the execution of the above-written agreement. It is alleged that at the time that agreement was executed Land owed the appellant, on previous purchases under contracts similar to the one here set out, the sum of $2,244.81, which was increased by other purchasers, and reduced payments made by Land. It was further alleged—

"that on or about June 30, 1921, plaintiff furnished to defendant Land a written statement showing that said Land then owed plaintiff a balance of $2,283, which amount said Land did then and there owe plaintiff; and thereafter, on or about August 16, 1921, and dated 8/16/21, the said Land, in writing, acknowledged receipt of said statement, and signed the same, which was on or about said time and date returned to plaintiff, and by it received, in which said acknowledgment said Land said, in substance, that he had examined said statement of his account, and found a balance due plaintiff on said Land's said account totaling $2,283, to be correct, on the date stated, and agreed to pay the same according to the terms of his current contract. And plaintiff says that the current contract therein referred to by said Land was and is the said contract hereinbefore alleged; that said sum of $2,283 was afterwards reduced to $2,247 by the credits made and shown in September, October, and November, 1921, in said account."

Land and his guarantors answered, denying under oath the correctness of the account or claim sued on. They also alleged that the writing set out in the plaintiff's petition was not all of the contract under which the goods were purchased. They pleaded that other contracts thereafter made constituted the real agreements that fixed the terms and conditions which controlled the purchases and sales made by Land; that these restricted him to designated territory, and to specific prices, below which he was not permitted to sell his merchandise. The only defense urged at the trial was the invalidity of the contract, because violative of the state anti-trust statute.

In response to special issues, the jury found that the contract under which the indebtedness of Land was incurred did restrict him to sales within certain designated territory; but they also found that he was not required to sell the merchandise at any fixed prices. Upon these findings, the court entered a judgment in favor of Land and his codefendants.

There is before us, then but one controverted issue of fact, does the evidence support a finding that Land was, by his contract, restricted to designated territory within which to sell, at retail, the merchandise which he had purchased from the appellant? If that finding is supported by the evidence, the court correctly concluded that the contract violated the anti-trust statute. W. T. Rawleigh Co. v. Watson (Tex. Civ. App.) 256 S. W. 955; W. T. Rawleigh Co. v. Smith (Tex. Civ. App.) 231 S. W. 799; Newby v. W. T. Rawleigh Co. (Tex. Civ. App.) 194 S. W. 1173; Whisenant v. Shores-Mueller Co. (Tex. Civ. App.) 194 S. W. 1175; Caddell v. Watkins Med. Co. (Tex. Civ. App.) 227 S. W. 226.

In determining whether the contract under which the business between the appellant and Land was conducted violated the anti-trust laws, the court had a right to look into and consider controlling collateral agreements, and enforced regulations and instructions to be observed by Land. If such latitude were not allowed, parties could easily thwart the ends for which this statute was enacted.

It appears that Land was engaged in a business which required him to travel from house to house in the country, and dispose of his wares, at retail, to private families. There is nothing in the written instrument previously copied which imposes any limitations upon his right to sell anywhere within the state. Appellant's witnesses testified that no such restrictions were ever created by any subsequent agreement or instructions. They say that Land had the right to sell his merchandise wherever he saw proper, and at any price he saw fit to impose. On the other hand, Land testified that he was furnished with literature showing that the country in that part of the state had been divided into districts, for distribution among retailers handling the appellant's goods in the same manner that he was expected to handle them; that he did select from the unoccupied territory, thus disclosed, a portion of Fannin county as his district, and in that district all of his sales were thereafter made. He

further testified, over the objection of the appellant, that when he began business he was informed by one of appellant's soliciting agents, in Texas, that appellant required its retail dealers to confine their sales to their respective districts; that one dealer would not be permitted to invade the territory of another dealer for the purpose of making sales.

That the appellant was interested in having only one salesman, handling its goods, operate in given territory is made plain beyond any doubt. The circular letters set out, describing territory as occupied and unoccupied, could have no other meaning. Land testified that he wished to sell goods in Hunt county because of its convenience of location, but was required by appellant's agent to select territory elsewhere. A number of letters were written to Land from appellant's office during the time he was at work, calling attention to adjacent vacant territory. He was urged to get other men interested in going there to sell goods, but not once was it suggested that he make sales in that vacant territory.

What is apparently relied on as the original written contract, under which the parties began their business relations, contains no binding obligations upon either the appellant or Land. The appellant does not obligate itself to sell any goods to Land, and the latter does not bind himself to purchase any. In retaining the option to sell or not sell to Land, as it saw proper, the appellant reserved the power to coerce him into compliance with any terms it might elect to impose as conditions upon which it would extend credit or supply him with merchandise. If these facts show a combination between the appellant and Land by which the latter was protected from the competition of other salesmen handling the appellant's goods, and other such salesmen were protected from the competition of Land, a clear infraction of the law is disclosed, and the agreement under which the business was conducted created no obligations which the courts will enforce.

But, conceding that the agreements under which the goods were actually sold and delivered to Land were prohibited by the anti-trust statute, does it necessarily follow that the appellant is not now entitled to recover a judgment for the value of the merchandise? If the appellant must rely upon the terms of the offensive agreements to prove an obligation on the part of Land to pay the debt, or if it must depend upon an implied promise growing out of the sale and delivery of the merchandise, in compliance with the terms of the illegal agreement, there can be no recovery. The law will not imply an enforceable obligation to comply with the terms of an illegal agreement. Contracts which violate the provision of the anti-trust law are void in the sense that they create no legal obliga-

tions which the courts will enforce. The parties to such agreements will be left just as if no contract had been made; that is, as far as the courts are authorized to go in proceedings of this character. Hall v. Edwards (Tex. Com. App.) 222 S. W. 167, and cases there cited. The penalties denounced against the guilty parties are inflicted in suits instituted for that purpose alone.

In the trial of the case appellant introduced, without objection, the following instrument:

"The W. T. Rawleigh Company. Monthly Statement of Account.

"Semiannual Approval of Account.

"June 30, 1921.

"B. B. Land, Texas.　　　421.
"May 31, 1921.............Balance, $2,283.

"Posted Ledger.

"Account Stated.

"Date 8, 16, 1921.

"The W. T. Rawleigh Co.—Dear Sirs: I have examined the above statement of my account and find the balance due you on my account, totalling $2,283, to be correct, on the date stated, which I agree to pay according to the terms of my current contract.

"Sign this and return to the company. Retain the duplicate for your files.

　　　　　"[Signed]　B. B. Land,
"P. O. Ladonia,
　　　　　"County Fannin, State of Texas."

The evidence showed that this instrument was sent to Land after he ceased to make purchases of merchandise from the appellant, as a final statement of his account. He was requested, if he found the statement correct, to sign and return that instrument to the appellant. This he did, and he does not now impeach its correctness, or deny its execution. That instrument was the final settlement between the parties. It was a distinct promise, within itself to pay a specified sum of money, and the appellant might have maintained an action against Land upon it alone without pleading the provisions of any antecedent contract.

When an illegal contract has been executed, and the unlawful conduct has been ended, the relation and situation of the parties may be such that they can make another contract valid and enforceable, in settlement of the financial differences resulting from the dealing under the illegal contract. If the promise sought to be enforced is not in furtherance of the illegal agreement, but is separate and distinct, it may be enforced notwithstanding the consideration upon which it must rest grows out of the execution of the original agreement. Hall v. Edwards, supra; De Leon v. Trevino, 49 Tex. 91, 30 Am. Rep. 101; Owens v. Davenport, 39 Mont. 555, 104 Pac. 682, 28 L. R. A. (N. S.) 996; Martin v. Richardson, 94 Ky. 183, 21 S. W. 1039, 19 L. R. A. 692, 42 Am. St. Rep.

353; Hertzler v. Geigley, 196 Pa. 419, 46 Atl. 366, 79 Am. St. Rep. 724; Hubbard v. Mulligan, 13 Colo. App. 116, 57 Pac. 738; Packard v. Byrd, 73 S. C. 1, 51 S. E. 678, 6 L. R. A. (N. S.) 547. This may be done when the principal transaction, which the offensive agreement sought to promote is a lawful one, and the vice of the contract lies in some collateral feature incidental only to the main object of the parties. If, at the conclusion of such a business enterprise, a balance remains which is due from one of the parties to the other, the law is not offended by making that balance the consideration for a new and distinct promise to pay the debt.

In this instance the appellant and Land were dealing in legitimate articles of commerce. They had a legal right to buy and sell such merchandise anywhere. Their contract was offensive only in restricting the territory where the retail sales were to be made. When the appellant sold its goods, it parted with something of value, and when Land received the goods, he acquired something of value. In so doing, Land incurred moral obligation, at least, which common honesty required him to discharge. He owed the appellant a debt which he could not repudiate without incurring the odium of dishonesty. That moral obligation was a sufficient consideration for the distinct promise to thereafter pay a sum of money equal to the value of the goods which Land had received, and for which he had not paid. Hall v. Edwards, supra; Bicocchi v. Casey-Swasey Co., 91 Tex. 259, 42 S. W. 963, 66 Am. St. Rep. 875; Cotton States Bldg. Co. v. Jones, 94 Tex. 502, 62 S. W. 741; 2 Elliott on Contracts, § 1085.

It is true the courts have sometimes held that a mere moral obligation does not furnish a sufficient legal consideration to support a promise to pay money. But an examination of those cases will show that the moral obligations there under consideration were predicated upon a moral duty growing out of some social or domestic relation, as, for instance, the moral duty to support a dependent relative, for which the promisor was in no way legally responsible. But we can recall no instance of where a moral obligation, based upon a distinct pecuniary benefit to the promisor, has been held to be insufficient to support a promise to pay the value of that benefit. We therefore conclude that, notwithstanding the vice in the original agreement under which Land purchased the goods, he is responsible upon the written promise executed by him after the illegal agreement had terminated.

The question, then, is, were his guarantors also responsible for that obligation? The contract signed by them contained no illegal provisions, nor did the contract executed by Land, to which the guaranty was attached, contain any illegal terms. The offensive provisions arose thereafter, and grew out of other agreements entered into between Land and the appellant. In their contract the guarantors bound themselves, unconditionally, to pay in full the balance due by Land on account, as shown by appellant's books at the date of the acceptance of this contract of guaranty, "and the full and complete payment of all moneys due or owing, or that might become due or owing, the seller, and all indebtedness incurred by" Land, under the terms of his agreement. They further agreed that "in any suit brought on this contract of guaranty by the seller, no other or further proof shall be required of it than to establish the amount or sum of money due and owing to it from the said buyer," and, when so proven, it should be conclusive and binding upon them. The guarantors are bound by any contract to pay for the goods which bound Land. They were not parties to any illegal contract, but they guaranteed that Land would perform, his legal obligations to pay for the merchandise he bought from the appellant.

For the reasons stated, the judgment of the trial court will be reversed, and judgment here rendered for the appellant, for the full amount sued for.

### On Motion for Rehearing.

[1-3] After further consideration, we have concluded that the record before us does not present a case coming within the rule of law discussed in the original opinion. The judgment of the trial court was reversed upon the assumption that the appellant pleaded and relied upon a contract which had been purged of its legal impurity; that while two considerations may have entered into the original obligation, one lawful and the other unlawful, the unlawful part had been eliminated, and only that which was lawful remained. A more careful inquiry into the evidence has convinced us that such an assumption is not sustained when the facts found by the jury are supplemented by those which, the judgment implies, must have been found by the trial court. According to the finding of the jury, the appellant and Land contracted and agreed that the territory in which Land was to sell the goods bought from the appellant was to be restricted. The evidence was such as to warrant the court in further concluding that the appellant also agreed not to sell goods to any other dealer in the territory to which Land was restricted. If that be true, then we have a "combination" between appellant and Land, to eliminate competition, which falls clearly within the condemnation of the Texas antitrust statute (Acts 1903, p. 119). Land, expressly or impliedly, agreed to do two things in order to secure the goods. One was to pay the purchase price, and the other to sell the goods only to people within his allotted territory. Likewise the appellant expressly

or impliedly agreed to do two things; one to sell the goods to Land at wholesale prices, and the other not to sell similar goods to any competitor in the territory allotted to Land. The inference is just as strong that the appellant agreed to protect Land from competition by other salesmen as it is that Land agreed not to compete with appellant's salesmen in other territory. That such a "combination" existed is amply supported by legitimate deductions from the undisputed facts. It is not required, in order to render the principal contract void, that the unlawful "combination" be disclosed by the terms of that contract. It is sufficient if the contract is a part of a covert scheme to conduct a business in an unlawful manner. If Land's promise to pay the purchase price of the goods was based alone upon the consideration found in the value of the goods, then his promise made after the unlawful enterprise had ended, and the scheme abandoned, might create an enforceable contract because of the moral obligation resting upon Land to pay for the benefits he had received. But if, as we now conclude is the true situation, his promise was based not only upon the consideration furnished by the value of the goods, but upon the further consideration that the appellant would not sell similar goods to a competitor in that territory, the new promise still contains a part of the original taint. If, at the time Land received the goods, he had given his promissory notes for the purchase price, and after the dealings had ended had renewed the debt by giving new notes based upon the old consideration, the new notes would be only an extension of a debt unenforceable because based upon an unlawful consideration. The character of this transaction is not legally different because of the form in which it is presented in the record.

We have concluded that the facts bring this case clearly within the rule announced in the following cases: Wegner Bros. v. Biering & Co., 65 Tex. 506; Reed v. Brewer, 90 Tex. 144, 37 S. W. 418; Columbia Carriage Co. v. Hatch, 19 Tex. Civ. App. 120, 47 S. W. 288.

The judgment heretofore rendered in this appeal will be set aside, and the judgment of the trial court will be affirmed.