FORD MOTOR COMPANY v. THE STATE OF TEXAS.

No. 8109. Decided October 27, 1943.
Rehearing overruled December 8, 1943.
(175 S. W., 2d Series, 230.)

6

*Gabe P. Allen* and *Allen & Allen,* all of Dallas, *Black, Graves & Stayton,* and *Charles L. Black,* all of Austin, *Clifford B. Longley, Wallace R. Middleton* and *Bodman, Longley, Bogle, Middleton & Armstrong,* all of Detroit, Mich., for petitioner.

It was error for the Court of Civil Appeals to hold that the various sections of the written contract mentioned were in violation of our anti-trust statutes. Fitchie v. Brown, 211 U. S. 321, 53 L. Ed. 202; American Trust Company v. Orson, 65 S. W. (2d) 779; Nevels v. Harris, 129 Texas 190, 102 S. W. (2d) 1046; MacPherson v. Buick Motor Co., 217 N. Y. 382; 111 N. E. 1050; Fort Worth & D. C. Ry. Co. v. State, 99 Texas 34, 87 S. W. 336.

*Gerald C. Mann,* Attorney General, *Grover Sellers, E. P. Price, Fred Chandler, Benjamin Woodall* and *Pat Coon,* Assistants Attorney General, for respondent.

After the owner of a patented article has manufactured and sold the same he cannot impose restrictions upon his vendee as to the future sale of same. Having parted with his ownership it enters the channels of trade and is an article of commerce beyond his control. Coca Cola Company v. State, 225 S. W. 791; Caddell v. Watkins Medical Co., 227 S. W. 226; State v. Willys-Overland, 211 S. W. 609.

MR. JUSTICE CRITZ delivered the opinion of the Court.

This is what we commonly call an anti-trust suit. It was filed in the district court of Travis County, Texas, by the State of Texas, acting by and through its Attorney General, against Ford Motor Company, a Delaware corporation, to recover many thousands of dollars in penalties, and to permanently enjoin Ford Motor Company from violating our anti-trust laws, Articles 7426 to 7447, inclusive, R. S. We shall hereinafter refer to the State of Texas as the State, and to Ford Motor Company as Ford.

The State filed six petitions in the district court. The district court sustained special exceptions to each of the first five,

which adjudged them respectively insuffieicnt to charge any violation of our anti-trust laws. When the State's sixth petition was presented, the trial court sustained certain special exceptions to it, which also adjudged it insufficient. The State refused to further amend, and the court entered a judgment finally dismissing this cause. The judgment of the district court was reversed by the Austin Court of Civil Appeals, and this cause was remanded for a trial upon its merits. 169 S. W. (2d) 504

We shall not attempt to set out the numerous special exceptions to the State's petition which were sustained by the district court. The law questions involved will sufficiently appear in the course of this opinion. The State's petition in the district court is very long, and we shall not attempt a detailed statement of its allegations. Any attempt to do so would extend this opinion to an unreasonable length. We shall make such statements in the course of this opinion as are sufficient to show the substance of the allegations involved.

By its pleadings in the district court, and by its briefs and arguments in the Court of Civil Appeals and in this Court, the State contends that certain provisions, which we will later quote and discuss, contained in an alleged written contract between Ford and all of its authorized Texas dealers, constitute on their respective faces agreements in violation of our anti-trust laws. The State also contends that if such provisions do not on their faces violate our anti-trust laws, Ford has violated such laws in its method of operation under such contract.

A copy of the contract here involved is attached to the State's petition and made a part thereof. It is sufficient at this point to say that it is not in any sense an agency contract. When Ford sells its products thereunder to its Texas dealers, it completely parts with title thereto, and the dealers become absolute owners thereof. As we understand this record, counsel for both parties to this action agree that this is a correct construction of this contract.

■ Before proceeding further we deem it advisable to announce certain general rules of law which we conceive will largely govern the decision and result of this appeal.

1. The petition in a suit for penalties must state all the statutory requirements with the same degree of certainty that is required in a criminal case. The petition in a penalty suit is not sufficient unless the essential facts necessary to constitute a

violation of law are averred. The general rule that all reasonable intendments will be indulged in to sustain a pleading in an ordinary civil case, does not apply to penalty suits. To the contrary, in penalty suits the plaintiff's pleadings are strictly construed, and will not be aided by inferences. 32 Tex. Jur., pp. 764, 765, and authorities there cited.

■ 2. A contract which merely agrees to do a certain thing "in so far as it is lawful for the dealer to so agree * * *" on its face constitutes no agreement to do the thing mentioned, if it is unlawful so to do. Nevels v. Harris, 129 Texas 190, 102 S. W. (2d) 1046.

■ 3. It is a violation of our anti-trust laws for one party to enter into a contract with another party, whereby it is agreed that goods or products sold by the one party to the other party for resale in this State shall be resold at fixed or agreed prices, or at prices to be fixed or determined by the original seller. W. T. Rawleigh Medical Co. v. Fitzpatrick et al (Civ. App.), 184 S. W. 549; Segal v. McCall, 108 Texas 55, 184 S. W. 188; W. T. Rawleigh Medical Co. v. Gunn (Civ. App.), 186 S. W. 385.

4. It is a violation of our anti-trust laws for one party to enter into a contract with another party, whereby it is agreed that goods or products sold by the one party to the other party, for resale in this State, shall be resold only in a restricted territory in this State. Newby v. W. T. Rawleigh Co. (Civ. App.), 194 S. W. 1173; Whisenant v. Shores-Mueller Co. (Civ. App.), 194 S. W. 1175 (writ dismissed) ; Fred Miller Brewing Co. v. Coonrod (Civ. App.), 230 S. W. 1099 (writ refused) ; W. T. Rawleigh Co. v. Lemon et al (Civ. App.), 247 S. W. 683; W. T. Rawleigh Co. v. Marshall (Civ. App.), 248 S. W. 153; J. R. Watkin Co. v. Myers (Civ. App.), 255 S. W. 1002; McCoonon & Co. v. Marshall et al (Civ. App.) 280 S. W. 323; W. T. Rawleigh Co. v. Bradberry (Civ. App.), 290 S. W. 870; Henderson Tire & Rubber Co., Inc. v. Roberts et al (Com. App.), 12 S. W. (2d) 154.

5. Any intentional course of conduct by the parties to a contract which accomplishes the result of enabling the seller to dictate or control the resale price of goods or products sold by him for resale in Texas, or which enables the seller to cause the purchaser to confine his resales to a restricted territory in this State, or which otherwise accomplishes results prohibited by our anti-trust laws, violates the same. W. T. Rawleigh Co. v. Lemon et al (Civ. App.), 247 S. W. 683; W. T. Rawleigh Co. v.

Land et al (Civ. App.), 261 S. W. 186, Id. 115 Texas 319, 279 S. W. 810. (See the opinion of the Supreme Court approving opinion of Court of Civil Appeals, 279 S. W. 814.) Burpee Can Sealer Co. v. Henry McDonnell Co. (Civ. App.), 75 S. W. (2d) 458 (writ refused); Henderson Tire & Rubber Co., Inc. v. Roberts et al (Com. App.), 12 S. W. (2d) 154.

This case involves some other principles of law, which we will announce in the course of our discussions.

The State contends that Section 5 of this contract violates our anti-trust laws. Such section reads as follows:

### "OPERATION OF BUSINESS.

"(5) Dealer agree to maintain a place of business and only one place of business, unless repair shops or used automobile outlets and/or neighborhool service stations are separate from salesroom, located in a place and equipped in a manner acceptable to Company; to display conspicuously thereon approved Ford signs; to install and maintain therein the tools, machinery and equipment recommended by Company; to employ sufficient, competent salesmen to solicit adequately all potential purchasers of Company products in the community in which Dealer is located, and sufficient, competent service mechanics to render prompt, efficient service to owners of Company products and to render such service to any owners of Company products engaging such service, including the service to which a purchaser of such products from Dealer (or from another dealer who has paid Dealer the Service Commission mentioned in subparagraph (c) of paragraph 9 hereof) is entitled; to install and maintain an accounting system in accordance with Ford Dealers Accounting Procedure Manual as approved by Company; to furnish Company at regular intervals as designated by Company accurate financial statements reflecting the true financial condition of Dealer's business on standard forms provided by Company for that purpose; to allow representatives of Company, at all reasonable times and from time to time, to examine, all records, contracts and accounts covering sale or service of Company products by dealer and to examine Dealer's stock and place of business and to test Dealer's equipment and facilities to the end that Company may be assured that Dealer is carrying out all of the terms of this agreement and is properly equipped to render adequate service to owners or operators of Company products; to submit promptly to Company, Dealer's Ten-Day Reoprts accurately and fully prepared on forms provided by Company therefor and on the dates specified therein."

When we break the above contract provision up into its parts, we find that it obligates the authorized Ford dealer:

(1)  To maintain a place of business.

(2)  To maintain only one place of business, where approved Ford signs are displayed.

(3)  To install in such place of business tools, machinery, and equipment recommended by Ford.

(4)  To employ competent salesmen to solicit potential purchasers of Ford products, and to employ sufficient and competent mechanics to render efficient service to the owners of such products.

(5)  To render efficient service to the purchasers of Ford products from a dealer other than the particular dealer who has paid to the contracting dealer a service commission, as provided by another provision of this contract.

(6)  To install and maintain an accounting system approved by Ford.

(7 ) To furnish Ford with accurate financial statements.

(8)  To permit Ford's representatives to examine the dealer's records, contracts, and accounts covering the sale and service of Ford products, and to examine his stock and test his equipment and facilities.

(9)  To submit to Ford ten-day reports, accurately and fully prepared on forms provided by Ford.

(10)  To conspicuously display at his place of business approved Ford signs.

■  We think that the contract provisions, as above detailed by us, on their faces, do not violate our anti-trust laws. There is nothing in such laws that requires a manufacturer to sell its manufactured products to any dealer or purchaser who wishes to buy same. To the contrary, such manufacturer may sell, or refuse to sell, at its pleasure. In electing to sell to a particular dealer, a manufacturer may lawfully require that such dealer maintain proper facilities and labor to furnish proper service

to the users of its manufactured products. This is a right of general interest to the manufacturer, to the dealer, and to the general public. The manufacturer is vitally interested in having its product give satisfaction to ultimate purchasers and users, and such ultimate purchasers and users cannot obtain satisfaction unless they are provided with convenient places where replacement parts and satisfactory repairs and service may be had. This section of the contract seeks to accomplish these results.

The State seems to argue that this provision of the contract is in violation of our anti-trust laws because it limits the number of places of business that the dealer may operate. We overrule this contention. There is nothing in our anti-trust laws which would prevent a manufacturer of automobiles from requiring an authorized dealer in its products to maintain a place of business where the manufactured product would be properly serviced. Such being the case, the manufacturer has the right to contract for the privilege of inspecting such place of business. It certainly cannot be required to inspect as many places of business as the dealer may see fit to operate. At this point we call attention to the fact that Ford dealers are given the right by this contract to display Ford signs, and to advertise themselves as authorized Ford dealers and service stations. Certainly this is not a right that any person may exercise at his will. To the contrary, such a business can be carried on only under a franchise from Ford. Lincoln Motor Co. v. Lincoln Automobile Co., 44 Fed. (2d) 812, and authorities there cited. At this point we hold, however, that the provisions of this section of this contract, regarding Ford's right of inspection of the dealer's records, contracts, and accounts covering the sale of Ford products, may constitute a circumstance to be considered by the trial court on the question as to whether Ford so operates under this contract as to fix prices or restrict territory.

■ The State contends that Section 9(b) of this alleged contract on its face violates our anti-trust laws, because it obligates Ford dealers not to sell Ford products at less than retail prices established by Ford for the dealer's city or town from time to time. This section of the contract reads as follows:

"(b) Insofar as it is lawful for Dealer so to agree, not to resell Company products bearing Company's trademark or trade name at less than retail prices established for Dealer's city or town from time to time by Company, except in cases where such goods have been damaged, or have become obsolete, or are about to become obsolete because of change in models, or in the case of sales to Company or its nominees or to other authorized

Ford Dealers, or Associate Ford Dealers, and except when a discount is warranted by quantity purchases unless such a discount is in violation of law. Dealer agrees, if requested by Company, to display prominently in Dealer's showroom a chart showing current minimum retail prices as established by Company for Dealer's city or town."

Under the rule of law already announced in this opinion, this contract provision, on its face, does not violate our anti-trust laws. It only obligates the dealer if it is lawful for him to be obligated. If it is unlawful, no obligation is assumed. If no obligation is assumed, no violation of law is contracted for.

■ The State contends that its petition is sufficient to charge Ford with a course of unlawful conduct towards its dealers in this State which operates to enable Ford to fix and determine the resale prices to be charged by Ford dealers for Ford products, and also to determine the prices that Ford dealers charge for servicing and repairing Ford cars. In this connection, the State contends that by its general course of dealings with its dealers, Ford does in fact control or unlawfully influence resale prices of its Texas dealers. The State's petition alleges: That this contract contains a provision that it can be terminated by either party after sixty days' notice; that the contract on its face attempts to bind the dealer to allow Ford to fix resale prices as far as it lawfully can; that Ford regularly distributes among its dealers a parts price list containing suggested retail prices on every automobile part and accessory manufactured by Ford; that it is agreed by and between Ford and its Texas dealers that said suggested retail prices contained in said parts list shall constitute the retail price on every automobile part and accessory manufactured by Ford; that Ford informs its Texas dealers by letters and telegrams of its suggested retail prices on all Ford manufactured automobiles.

To our minds the above allegations are sufficient in law to charge Ford with unlawfully controlling resale prices of its products in Texas. Simply stated, we think that if Ford pursues a general policy of determining the prices which are to be charged for its products in Texas by Texas dealers, and then accomplishes that result by a course of conduct designed and intended for that purpose and calculated to accomplish it, it has violated our anti-trust laws just as effectively as if it had accomplished such result by direct contract. Here Ford certainly made a contract which, at least, suggested that it desired to fix prices so far as it might lawfully do so. It then draws a contract that

it may terminate at will by giving sixty days' notice. It contracts for the right to inspect its dealers' records. It then furnishes the dealers with suggested prices. Certainly these facts, taken with the other alleged facts supra, present an ultimate fact issue as to the control of resale prices to be determined by a trial court. It is certainly the intention of our anti-trust laws to guarantee dealers in this State the untrammeled right to sell goods, wares, merchandise, and products owned by them at such prices as they may determine.

■ The State contends that Section 9(c) of this contract, on its face, violates our anti-trust laws. The State further contends that if such contract provision, on its face, does not constitute a violation of our anti-trust laws, still it violates such laws when considered in the light of its practical effect and certain alleged surrounding facts and circumstances. In connection with its second contention, the State contends that the above contract, as operated under, has the effect to restrict in a material way Ford dealers in this State to certain defined territories, respectively, in the sale of Ford products. We shall decide these contentions in the order in which we have mentioned them.

Section 9(c) of this contract reads as follows:

"SERVICE COMMISSION.

"(c) That as convenient Authorized Ford Service must be made vailable to users of Ford passenger automobiles, commercial automobiles and trucks and as a means to that end, in case Dealer sells a new passenger automobile, commercial automobile or truck to a buyer residing in another city or town where an authorized direct Ford Dealer is located or operates a Neighborhood Service Station under a Supplementary Sales Agreement with Company, or to a buyer residing in another incorporated municipality in which there is no such Ford Dealer or Neighborhood Service Station, but which municipality is contiguous to a city or town in which an authorized direct Ford Dealer is located, Dealer shall pay a service commission of Thirty Dollars ($30.00) to the dealer in the town where purchaser resides within five (5) days after the unit is delivered to buyer with the understanding that such other dealer agrees to render to such purchaser the service which a new car purchaser ordinarily receives from the delivering dealer. In case purchaser is a resident of a multiple dealer metropolitan area, as defined below, and Dealer's place of business is not in that area, Dealer shall pay such service commission to the Authorized direct

Ford Dealer located nearest to place of residence of purchaser. The requirement of this sub-paragraph (c) that dealer pay a service commission shall not apply, if Dealer is located in a multiple dealer metropolitan area (meaning thereby a city and such surrounding territory as Company in its absolute discretion may from time to time include within the metropolitan area of that city) and sells to a purchaser residing anywhere within such metropolitan area, to sales to owners of fleets of five (5) or more automobiles and/or trucks, or to sales to purchasers temporarily residing for more than thirty (30) days at the place where Dealer is located. Company will act as umpire between dealers in connection with these service commissions, but does not guarantee payment of any such service commissions."

The State's petition also alleges that certain Ford dealers handle Mercury, Lincoln-Zephyr, and Lincoln automobiles, which are all Ford products, and that Ford dealers who sell such products are governed by the same rules as to paying service charges that govern in the sale of Ford cars, except such service charges are $40.00 on Mercury, $50.00 on Lincoln-Zephyr, and $125.00 on Lincoln cars.

We are of the opinion that the above-quoted service charge provision, as contained in this section of this contract, on its face, discloses no violation of our anti-trust laws. Such provision, on its face, discloses no intention on the part of Ford or its dealers to restrict Ford dealers to any defined territory in the sale of Ford products. Under the provisions of this contract all dealers appear to be on an absolute equality, and all assume the same obligation. For aught that is disclosed on the face of the contract, the service charge is fair and worth the amount provided for. Ford is vitally interested in satisfied customers. In order to obtain such it is necessary for Ford products to properly perform through years of service. The way in which a new car is broken in has a permanent effect on its future performance and the length of time it will last. In order to obtain such result Ford requires its dealers to provide certain service for new cars, without extra cost. It is reasonably necessary for this service to be made convenient to the purchasers of new cars, so that they will avail themselves of it. Finally, the contract does not show the kind, quality, extent, or value of such service, and in the absence of such showing it cannot be said that it, the contract, shows any illegality or ulterior motive on its face.

■ We now come to decide whether the State's petition alleges facts which would show, or tend to show, that this contract pro-

vision constitutes a violation of our anti-trust laws when considered in the light of the alleged surrounding facts and circumstances and the manner and effect of operation thereunder. In order to decide this question we deem it proper to make a statement containing the substance of the State's allegations regarding such matters. The State's petition, in substance, alleges: That the service charges above described constitutes penalties imposed upon dealers for selling Ford cars to purchasers who reside outside such dealers' territory; that such charges constitute penalties, because the cost and value of such service charges are grossly out of portion to the cost of performance; that the average cost of performance is about $2.50 per car, whereas the service charges are $30.00, $40.00, $50.00, and $125.00 per car, as above indicated; that a dealer does not, on the average, make more than the amount of the service charges on a new car when he takes in a used car; that in most instances he takes in a used car; that such service charges have effect to cause all dealers to confine their sales of new cars to customers who reside in their respective territories, because the penalty imposed by these service charges makes it unprofitable to sell to purchasers residing outside of such territories; and that Ford intends these service charges to so act as to deter and prevent Ford dealers from selling new cars to customers residing outside their respective territories.

We have not attempted to set out the exact language of the State's petition in regard to the extent, effect, and operation of the above-quoted service charge provisions of this contract, but we think we have made a fair statement of the substance thereof. In our opinion, such allegations are sufficient to present for trial the ultimate fact issue as to whether the practical result of this provision of this contract is to confine Ford dealers to a restricted territory in this State in making resales of Ford products.

The State contends that Section 9 (d) of this contract violates our anti-trust laws. This provision reads as follows:

"(d) That in view of the fact Company has in its advertising consistently urged the ultimate users of Company products to patronize its authorized dealers as being proper sources from which to procure genuine Ford, Mercury, Lincoln or Lincoln-Zephyr parts, Dealer will not, in any place of business upon which Dealer displays Company's trade mark or trade name, or any sign of indication that such place of business is that of an authorized Ford Dealer, or an authorized Ford Service Station, sell any replacement parts for Company products except such genuine parts, nor shall Dealer recommend or allow to be

recommended in such place of business, nor use in servicing Company products for owners thereof any but genuine Ford, Mercury, Lincoln, or Lincoln-Zephyr parts except in cases where Company is unable to supply same or owner has specifically requested Dealer to use some other part."

An analysis of the above contract provision will disclose that to a certain extent it amounts to a contractual restriction of the sale of automobile parts; but such restriction is not a general one. It only applies where the parts are to be placed in Ford cars; and then it does not apply if the car owner requests the dealer to use some other part. We think, as above construed, this contract provision does not violate our anti-trust laws. Pick Mfg. Co. v. General Motors Corp. et al, 80 Fed. (2d) 641, Id. 299 U. S. 3, 57 Sup Ct. 1, 81 L. Ed. 4.

In the case just cited it was contended that a contract entered into between Chevrolet Motor Company with one of its authorized dealers violated the provisions of Section 3 of the Clayton Act, 15 U. S. C. A., sec. 14. The contract provision attacked reads as follows:

"Dealer will agree that he will sell genuine, new Chevrolet parts and accessories at not more than the current list price issued by seller. Dealer will agree that he will not sell, offer for sale, or use in the repair of Chevrolet motor vehicles and chasis, second-hand or used parts or any part or parts not manufactured by or authorized by the Chevrolet Motor Company, division of General Motors Corporation. It is agreed that dealer is not granted any exclusive selling rights in genuine Chevrolet parts."

In passing on the validity of the above contractual provision the United States Circuit Court of Appeals, Seventh Circuit, said:

"The automobile is a complicated mechanism, the refined product of scientific engineering after long investigation, close competition, experiment, and practical experience. Replacement and repair parts must be of accurate measurement, appropriate, satisfactory material, and proper mechanical construction. Otherwise, disaster may result. Appellees insist with their dealers, therefore, that the latter shall not repair appellees' product with used or second-hand parts or with parts other than those manufactured by appellees, or for them under their specifications, for the express purpose of replacing parts in or repairing their product. These dealers may repair any make of

automobile, and in doing so they may employ parts manufactured, by appellant or any other independent manufacturer, provided the car being repaired is not appellee's product. The restriction is applicable only to appellees' cars. Clearly this protects appellees against the otherwise possible use of defective parts in repairing or making replacements in their products. The preservation of the good will of the public is directly involved."

A reading of the contract provision here attacked and the one attacked in the Pick Manufacturing Company case, supra, will disclose that the two provisions, in so far as the questions here involved are concerned, are practically the same. If one is not in violation of law, the other is not. We think that our law has not been violated in this instance for the same reasons that the United States Circuit Court of Appeals gave for holding that the Clayton Act was not violated in the Pick Manufacturing Company case.

The above contractual provision applies only to the "place of business" where an authorizel Ford dealer "displays Company's trademark, or trade name, or any sign or indication that such place of business is that of an authorized Ford Dealer or an authorized Ford Service Station." It therefore applies only to sales made by the Ford dealer at the place of business defined in Section (5), supra, of this contract. As already indicated in this opinion, the use of the Ford trade name and trademark, and the holding out to the public by the dealer that he is an authorized Ford dealer, and that he is selling Ford products, including Ford parts and Ford service, constitute representations to the public that the dealer is furnishing a service that is devised, inspected, and approved by Ford. Such is not a business that any dealer may engage in as a matter of common right under the laws of this State. It can only be carried on by a dealer by permission or franchise from Ford. Lincoln Motor Co. v. Lincoln Automobile Co., 44 Fed. (2d) 812.

From what we have said it is evident that we hold that none of the provisions of this contract discussed by us, on its face, violates our anti-trust laws. It is further evident that we hold that the State, in the particulars indicated in this opinion, has alleged a cause of action for violating our anti-trust laws against Ford by manner of operation.

The judgment of the Court of Civil Appeals, which reverses the judgment of the district court and remands this cause for

a new trial, is affirmed; but it is ordered that in another trial the trial court shall be governed by this opinion.

Opinion delivered October 27, 1943.

Rehearing overruled December 8, 1943.