

# THE ATTORNEY GENERAL

## OF TEXAS

CRAWFORD C. MARTIN
ATTORNEY GENERAL

AUSTIN, TEXAS 78711

February 21, 1969

Commissioner Francis A. Miskell
Consumer Credit Commissioner
P. O. Drawer "WW"
Capitol Station
Austin, Texas 78711

Opinion No. M-343

Re: Whether "chain" or "pyramid" selling plans, involving the sale of distributorships primarily and the sale of merchandise secondarily, constitute lotteries or violate the Deceptive Trade Practice provision of the Texas Consumer Credit Code or the Texas Anti-trust Act

Dear Mr. Miskell:

You have requested our opinion concerning certain chain or pyramid selling plans wherein the sale of distributorships is primary and the sale of merchandise is secondary, and have inquired as to whether such plans constitute lotteries, or are in violation of the Deceptive Trade Practice provision of the Texas Consumer Credit Code, or the Texas Anti-trust Act.

The four selling plans in question, which are summarized from the various instruments, documents, charts and memoranda furnished by your office, all operate in much the same way, three being almost identical, and the fourth different in operation.

The three similar pyramid plans are utilized to distribute a product through four levels from the company to the public. One company sells an automobile accessory called a "vapor-injector" which ostensibly increases gasoline mileage, reduces exhaust emissions, and results in the use of lower octane rated, less expensive gasoline. The second company sells an automobile accessory called a "gyromatic safety control" device which ostensibly prevents out-of-control skidding. The third company sells a line of cosmetics.

The company utilizing the fourth pyramid plan, unlike the others, does not sell a product through its distributors but utilizes a three level pyramid organization to distribute cards which entitle the card-bearer to shop at the company's discount stores.

Members of each of these pyramid plan organizations are recruited by the company at periodic and regular company sales meetings held once a week or more. At these meetings little time is spent by the company explaining the product, but a great deal of time is spent explaining the pyramid distribution concept and plan, and its benefits to the members. In the three similar plans, the product distribution plans, the companies represent that a person can join the organization and become a distributor by purchasing the required number of units of their product and then realize a tremendous income after a short period of time by simply recruiting other distributors who will buy the product from the distributor who recruited them. The number of products required to be purchased to join the organization is determined according to which of the four levels is chosen; the higher the level, the greater the number of units required to be purchased. Price differentials are made between the levels of the pyramid, with the higher levels enjoying a lower buying price. This differential is called an "override". In addition to the "override" received on each unit of the product sold to a lower level distributor, each distributor receives a "training fee" from each new distributor he recruits. The "training fee" is ostensibly compensation for the recruiter's time in explaining the distribution plan of the company and teaching the new distributor to market the product. The company represents to prospective distributors that by simply recruiting several others into the pyramid at each succeeding sales meeting a distributor can move steadily up the pyramid and expect to realize an income close to $100,000 within a year. One of these pyramid plans computes its figures by using an average of five people recruited into the organization by each other person in the organization each month. The companies do not explain the market potential of their products, and they do not screen the prospective distributors to determine their selling ability or financial responsibility.

The company utilizing the fourth pyramid plan holds sales meetings on a weekly basis and recruits members in the same way as the other three plans. To join this card distribution pyramid organization a person must pay an enrollment fee which is priced according to the level chosen, a higher price for a higher level.

Then he must pay a monthly service charge to remain a member. The members distribute company cards with their distributor number thereon to several hundred people, and then receive a percentage of the profit on the merchandise purchased at a company store by one of their card-bearers. The distributors in the pyramid in line above the distributor whose card is used also receive a percentage of the profit. No product is bought and sold by these pyramid plan members. They merely distribute cards and bring prospective members to the sales meetings.

## LOTTERY

In Texas the term "lottery" is said to have no technical signification in the law; and since the prohibitory statute (Art. 654, Vernon's Penal Code) fails to provide any definition, its meaning must be determined from popular usuage in the common law, with due consideration to the public policy underlying the authority. 37 Tex. Jur. 2nd 493, Lotteries, Sec. 1.

It is well settled in Texas that a lottery is composed of three elements: (1) a prize or prizes;

> (2) the award or distribution of the prize or prizes by chance; and

> (3) the payment either directly or indirectly by the participants of a consideration for the right or privilege of participating.

City of Wink v. Griffith Amusement Company, 100 S.W.2d 695 (Tex. Sup. 1936); Smith v. State, 127 S.W.2d 297 (Tex. Crim. 1939); Brice v. State, 156 Tex. Crim. 372, 242 S.W.2d 433 (1951); State v. Socony Mobil Oil Company, 386 S.W.2d 169 (Tex. Civ. App. 1964, err. ref., n.r.e.).

In the facts presented in the product distribution plans it appears that the money to be received by each distributor as an "override" commission for the sale of the product and the money received as a "training fee" for helping to recruit people into the organization would constitute the prize which is the first element of a lottery. The third element, payment of consideration by the participants for the right to participate, also clearly appears as a part of these pyramid selling plan arrangements. The consideration for the opportunity to receive the prize is the purchase price

paid for the products purchased, either from the company or from someone higher than the purchaser within the organization, and the "training fee" paid.

In the card distribution plan the first element of a lottery, the prize, is the percentage of the purchase price received by the card distributor whenever one of his card-bearers makes a purchase at a company store. The third element consideration, is the member's enrollment fee and the monthly service charge which must be paid to remain a member.

The second element of a lottery, the distribution of the prize by chance, requires a closer analysis in the light of the decisions as to whether or not the dominating element of the entire scheme is that of chance or that of skill, judgment, or ingenuity. 54 C.J.S. 846, Lotteries, Sec. 2b(2), and cases there cited. If the plan or game depends entirely on skill, it is not a lottery, although prizes are offered for the best solution. Boatright v. State, 118 Tex. Crim. 381, 38 S.W.2d 87 (1951). If chance predominates over skill or judgment and permeates the whole plan, a lottery is established. Sherwood & Roberts-Yakima, Inc. v. Clyde G. Leach, 67 W.D.2d 618, 409 P.2d 160 (Wash. Sup. 1965).

In the opinion to which you referred in your first letter, Attorney General Opinion No. C-619 (1966), it was held that a chain referral selling plan containing the elements of a prize constituted a lottery in Texas, where the participants who paid for the merchandise and turned in a list of names to the company had no control over whether the people they named on that list were contacted by the company, and sold the merchandise which would result in a rebate to them. There much of the lottery law from other states as well as Texas was reviewed to determine whether chance predominated over skill and judgment in the plan, and we held that it did because it was inherent from the lack of control which the participants had over whether the persons they named and referred were sold the merchandise. In the card distribution pyramid plan in question here, chance appears to be the dominant element over skill, judgment, or ingenuity as it was in Attorney General Opinion No. C-619. A participant in this plan receives no prize at all unless one of his card-bearers happens to shop at one of the company stores, and makes a purchase. He has no control over where his card-bearers might shop. Granted he might screen carefully the people to whom he gives his cards, but even if he gives them to his best friends and relatives who he thinks will shop at one of these stores, he is not assured that they will shop there. He does control the people he brings to the organizational

sales meetings and encourages to join the pyramid plan, but he has no control over the shoppers to whom they in turn give their cards and whether those people shop at a company store or not. Therefore, it appears to us that the element of <u>chance</u> predominates over any <u>skill</u> or <u>judgment</u> in the card distribution plan. <u>Chance</u> is inherent in the plan through the lack of control of the card-bearers. This plan thus constitutes a lottery in Texas within the meaning of the common law and Article 654, Vernon's Penal Code.

The product distribution pyramid plans present a closer question on the element of <u>chance</u>, which we think would have to be submitted to the fact finder in a court of law. On the face of all three plans there appears to be simply a business arrangement involving independent contractors contractually bound to other independent contractors. The distributors at the various levels purchase the products for resale and resell them to whom they please. Resale to the public, of course, involves a certain amount of selling <u>skill</u>, <u>judgment</u> or <u>ingenuity</u>. These three plans would certainly not be lotteries if the sale of merchandise were primary. However, the sale of merchandise appears to be only secondary to the sale of distributorships, with the result that a distributor's success hinges more on his ability to recruit lower level distributors than on his ability to sell the product. We are unable to ascertain from the material which we have received describing these three plans whether, in fact, any of the distributors at any level ever attempt to sell the product to the public. Someone must sell the product if anyone in the organization is to realize a return on his investment. We also cannot ascertain whether, in fact, any of the upper level distributors help train the lower level distributors or help them in their sales efforts if the lower level distributors do attempt to sell the product to the public. Some skill or judgment certainly is required to convince friends, relatives, and acquaintances to come to the sales meetings at which the organization leaders explain the pyramid plan and the benefits of it. Further, we cannot ascertain from the material which is available describing these plans whether the members of the pyramid organizations help at the sales meetings in selling the pyramid concept and in convincing prospective distributors to join the organization. If the members do sell the product, train new distributors, and/or help sell the pyramid concept, then they are exerting some degree of <u>skill</u>, <u>judgment</u> or <u>ingenuity</u> in making the organization workable and profitable, and <u>chance</u> would be a less dominant factor.

These three plans differ from the plan, concluded as a matter of law to be a lottery, in Attorney General Opinion No. C-619 in that here the members of the plans can sell the product and/or can help convince others to join the organization and/or can help train or supervise the recruited distributors, whereas in the referral selling plan considered in Attorney General Opinion No. C-619 the participants in the plan had no control whatsoever once they turned in the list of names to the salesman. We conclude, therefore, that there is a fact question in these three product distribution pyramid

plans as to whether there is enough skill, judgment or ingenuity exerted by the distributors and members of the plans to predomi- nate over the chance element, which is certainly present to some extent.  This office has no authority to determine fact questions, which is the province of the trier of facts in a court of law.

### TEXAS CONSUMER CREDIT CODE
### DECEPTIVE TRADE PRACTICE

We have examined pyramid selling plans generally, and not specifically the four described above, in light of the Deceptive Trade Practices provision of the Texas Consumer Credit Code, Article 5069 - 10.01, et seq., Vernon's Civil Statutes.

If a pyramid selling plan has as its primary purpose the sell- ing of a product only to members and prospective members of the organization rather than to the public at large, then a representa- tion, or the creation of an illusion, that the primary purpose is to sell the product to the public will constitute a false represen- tation of the purpose of the plan and a "deceptive practice" under our construction of the Texas Consumer Credit Code.  If the primary purpose is to sell the product to the public, then public sales figures or potential sales figures must not be falsely represented; and an inaccurate or exaggerated claim of sales, expressed or im- plied, will constitute a "deceptive practice" under the Texas Consumer Credit Code.

Typically a pyramid plan sales pitch stresses to the prospec- tive members the numerical progression possible for building an organization.  Such a sales pitch might envision each member of a pyramid organization recruiting five others into the organization each month, and those five recruiting five others each, etc. from month-to-month.  It is apparent on its face that such a numerical progression cannot continue long without saturating the market. Thus, one of two occurrences is certain.  Either the market will soon be saturated, or more likely, the progression will not con- tinue to operate in the way that it is represented, because some members will not recruit other members.  In either instance, a "deceptive practice" is committed because the pyramid does not and cannot continue to grow and progress as represented.  To avoid a "deceptive practice" in stressing the numerical progression of a pyramid plan, the sales presentation should not create the illusion that such a progression will work for everyone or continue beyond a short time.

### TEXAS ANTI-TRUST ACT

You have also requested our opinion concerning pyramid selling plans as they might violate the Texas Anti-trust Act.  Again we have considered pyramid plans generally in light of this law.

Pyramid organizations generally regard each member not as an agent but as an independent contractor, bound by the terms of a written contract. The typical pyramid organization's contract terms require that these independent contractors, their members, buy products exclusively from the immediate superior who recruited them and sell exclusively to the immediate subordinates whom they recruited into the pyramid. Additionally, the contract terms typically fix the price of the product according to levels in the pyramid. Such contract terms violate the Texas Anti-trust Act. There is no doubt now that the Texas Anti-trust Act forbids such "exclusive dealing" and "price fixing" agreements in Texas. Title 2, Texas Business and Commerce Code, Sec. 15.01, et seq.; Ford Motor Co. v. State, 142 Tex. 5, 175 S.W.2d 230 (1943).

We are unable to say unequivocally whether the four pyramid plans described earlier in this opinion violate the Texas Consumer Credit Code or the Texas Anti-trust Act. The memoranda detailing their operations is not complete enough to so determine. Thus, a fact question is raised which would have to be decided by a court of law.

It is our opinion, however, that if the pyramid plans in question operate by use of the false representations discussed in the past few paragraphs, or their promoters engage in conduct which creates confusion or misunderstanding about their selling plans, they violate the Texas Consumer Credit Code. Additionally, if they rely upon "price fixing" or "exclusive dealing" contract arrangements written or oral, they violate the Texas Anti-trust Act.

## SUMMARY

The card distribution pyramid plan constitutes a lottery in Texas within the meaning of the common law and Article 654, Vernon's Penal Code, because it contains the elements of a prize and consideration for the opportunity to win a prize, and the award thereof is determined by chance which is inherent from the participants' lack of control over the pyramid plan's success, and chance predominates over skill, judgment or ingenuity. In the three product distribution pyramid plans considered, a fact question is raised as to whether chance dominates over skill, judgment or ingenuity. This is a question for the trier of facts in a court of law and one which this office may not decide.

If the pyramid plan promoters make false representations or engage in conduct which creates confusion or misunderstanding about their selling plans, they commit a "deceptive practice" in violation of the Texas Consumer Credit Code, Article

5069 - 10.01, et seq. Pyramid plans which rely upon "price fixing" or "exclusive dealing" agreements are in violation of the Texas Anti-trust Act, Section 15.01, et seq., Texas Business and Commerce Code.

Yours very truly,

Crawford C. Martin,
Attorney General of Texas

Prepared by Richard W. Chote
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Kerns Taylor, Chairman
George Kelton, Vice-Chairman
Tom Bullington
A. J. Gallerano
Robert Owen
Malcolm Smith

W. V. Geppert
Staff Legal Assistant