**J. S. ERICKSON, Appellant,**

v.

**The TIMES HERALD PRINTING CO.,
Appellee.**

No. 14785.

Court of Civil Appeals of Texas.

Dallas.

July 2, 1954.

Rehearing Denied Sept. 24, 1954.

Mullinax & Wells and Chas. J. Morris, Dallas, for appellant.

Robertson, Jackson, Payne, Lancaster & Walker and Donald C. Fitch, Jr., Dallas, for appellee.

YOUNG, Justice.

Appellant's action as plaintiff in trial court was in tort against appellee corporation; alleging that the latter, a newspaper publisher in the City of Dallas, was party to a trust or combination in violation of the Texas Anti-Trust Laws, arts. 7426, 7428, and 7429, V.A.C.S., and that he has suffered actionable damages as the proximate result of such violations. On hearing, defendant's motion to dismiss the suit was sustained, on ground that said amended petition stated no cause of action; and plaintiff having declined to amend, the cause was dismissed with result of this appeal.

In lengthy pleading, plaintiff designates himself as an "independent contractor" who for many years prior to March 30, 1953

"depended for his livelihood on the purchase of newspapers at wholesale from defendant, which he sold to route carriers under contract to him for sale and distribution by subscription to retail customers"; and as background of his present claim alleges the following: That before 1935 all of defendant's newspapers distributed in Dallas County were delivered by its employees, at which time the independent contractor system was extended to all parts of the county, outside of the City circulation area, which until 1951 continued under a district manager employed by defendant, supervising and selling newspapers directly to route carriers; but that the plaintiff had been an independent dealer in defendant's newspapers "long before the system of using independent contractors for city circulation was generally adopted."

Exclusive of the territory covered by plaintiff, the general method of distribution in effect for city subscriptions prior to above date was then alleged, viz.: That defendant would contract with each carrier boy under which the latter bought his papers outright, paying a wholesale price therefor ($2^{11}\!/_{14}\cent$ per paper), making door to door deliveries; realizing his profit from the difference between the wholesale price and that for which he delivered them; that defendant's trucks would carry the papers to a "drop point" on each of the twenty to forty carrier-boy routes, and since there were approximately 1,000 carrier boys in the City area, it was divided into districts, of which there were around twenty-nine in 1951. That when defendant changed over to the independent contractor system, it terminated the employment of district managers, negotiating contracts with individuals whereby each became an independent dealer buying his papers in bulk and at wholesale, selling papers to each carrier boy in his district, paying all expenses thereof; his earnings consisting of the difference between wholesale cost and the price for which he sold them.

Plaintiff then set forth the successive contracts he had consummated with defendant as an independent dealer, denominating his described territory as "exclusive"; same being enlarged at times by the parties and then reduced; on October 2, 1952 entering into a written contract which remained in effect until March 28, 1953, with territory known as District M (definitely outlined on defendant's map of City districts); paying for all papers received at rate of 2.15¢ per copy other than Sunday editions; the same rate obtaining for Sunday issues up to the daily average of papers for weekdays, and 7¢ per copy "above said daily average"; a cash performance bond being a part of each contract. On March 13, 1953 defendant, through its circulation manager, terminated this contract (same provided therefor on ten days' notice) in the following letter: "It is our desire and intent to terminate your contract effective fifteen days from this date, for reasons already stated to you. We are prepared to offer you another contract, covering from Fifty to Sixty percent of your present territory, at a rate yet to be settled upon, and individual carrier bundles to be spotted by Times Herald Truck." The contract then tendered plaintiff was the same as existed between defendant and all other city dealers; said uniform contract thus put into effect, and still in effect, being quoted below (omitting cash performance bond and stipulations deemed immaterial, Footnote [1]).

Plaintiff further alleged a refusal to enter into this new contract for reduced ter-

1. "The Times Herald Printing Company
Publishers of The Daily Times Herald
Independent City Dealer Contract
"The State of Texas |
County of Dallas |
"This agreement made and entered into by and between the Times Herald Printing Company, a Corporation, hereinafter styled First Party, and ...............
hereinafter styled Second Party:

Witnesseth:
"First Party hereby sells and agrees to sell to Second Party such numbers of copies of The Daily Times Herald, both Sunday and other week day editions, as Second Party shall require for his sales and deliveries thereof in the following territory, namely:
"That territory, known as Times Herald District * * *, which district is more

ritory because of the substantially smaller income that would result; defendant refusing to sell plaintiff papers sufficient to cover distribution in his former territory; and thereafter refusing to sell to plaintiff at any discount price, but offering to furnish whatever papers he desired at retail rates; defendant then contracting with one Raymond Meade to take over the portion of plaintiff's formerly serviced territory known as District M, plaintiff characterizing same as "exclusive"; said agreement having prevented him from engaging in the business of selling and distributing defendant's paper in any of the territory given Meade; that defendant has like exclusive contracts with all of its city independent dealers, resulting, as he claims, in mainte-

nance of "an unlawful trust or combination, which creates, or tends to create, or carries out restrictions in trade or commerce or aids to commerce, and creates and carries out restrictions in the free pursuit of the business of buying defendant's product, The Daily Times Herald, and reselling same to carrier boys and the general public, such being a business permitted by laws of this State. Said agreement or combination prevents or lessens competition in the sale or purchase of said newspaper or in the preparation of such newspaper for market or transportation; and said agreement or combination fixes or maintains the retail price of said newspaper as controlled or established by defendant"; and thus, he charges, that defendant with malice and

definitely described on the map of city districts in the office of the First Party's Circulation Manager.

"Second Party will pay to the First Party at Dallas in Dallas County, Texas, all bills in full on or before the Thursday of each calendar week (Sunday through Saturday) for all papers received during the next preceding calendar week at the rate of * * * cents per copy for the said Daily papers published on days other than Sundays; and * * * cents per copy of Sunday papers up to that number of Sunday papers equal to the daily average for week days and * * * cents per copy for Sunday papers above the daily average, it being understood that the number of Sunday copies to be charged at the said rate of * * * cents per copy will be determined by the total number of daily copies (of week days other than Sundays) received during the week divided by the number of week days (other than Sundays) in such week giving the daily average. The rate of * * * cents per copy will be charged for all Sunday papers above the said daily average. Second Party agrees to procure from First Party at a place or places and at the time designated by First Party, said papers.

"Second Party at any and all times upon request of First Party will furnish to First Party a full and complete list of all concerns and individuals to whom the said newspapers are delivered, giving their names and addresses including home and all other deliveries.

"Second Party agrees to use his best efforts to make as many deliveries in said territory as possible.

"Second Party is to provide at his own expense such transportation and help as in his opinion he may need for said deliveries of said papers and Second Party shall have full power to employ, control and discharge any or all assistants needed by him.

"Second Party agrees to at all times hold First Party harmless from any action, cause, causes of action, damages, costs, expenses, claims or demands whatsoever in law or in equity, which may arise from or grow out of or in any way be incident to the work to be performed hereunder by Second Party, his employees or agents; it being expressly agreed that Second Party occupies at all times the position of purchaser and independent contractor and controls all ways and means relating to the proper performance and completion of this Contract.

"It is also agreed that either party may terminate this Contract by giving to the other party ten days' notice in writing of the desire of said party to so terminate the same.

"Witness the Hands of the Parties Hereto This The .... day of ........ 19...

The Times Herald Printing Company
By ....................
First Party
....................
Second Party
Appointed by:
............
Effective
———————"
(Date)

intent, through such combination, has established "the price which the ultimate retail consumer pays for The Daily Times Herald in violation of the Anti-Trust Laws of this State"; and forcing him out of a business in which he has been engaged for 27 years.

As stated, appellant's suit is founded in tort, claiming no contractual rights; but that he, on the other hand, has been put out of business perforce of these dealership contracts of an exclusive nature, which also served to fix the price paid by the ultimate consumer for defendant's newspaper. He asserts that a cause of action is alleged on such basis; the trial court erroneously ruling otherwise. Underlying plaintiff's resort to Anti-Trust Laws appears his conviction that defendant should be thereby required to continue the sale of its papers to him at discount prices; and this, though the same city area has been farmed out to another under contract to which he was formerly a party. However, under arts. 7426, 7428, and 7429, V.A.C.S., a manufacturer may sell or refuse to sell to any person at his pleasure; the cited Articles of course making illegal any contract restricting the dealer's resale of intrastate goods to a given territory, or an attempted dictation of the retail price of such goods. Ford Motor Co. v. State, 142 Tex. 5, 175 S.W.2d 230; Nu-Enamel Paint Co. v. Davis, Tex.Civ.App., 63 S.W.2d 861.

■ But can the alleged contract of March 1953 be deemed thus vulnerable to attack as in violation of our laws against monopolies; in other words, an exclusive one, effectually fixing the price of appellee's newspaper to dealers, within meaning of art. 7426 et seq.? We think not. The designation of a specific territory to a named dealer, as the contract provides, though an obvious requirement for securing to defendant's paper a complete coverage in a given area, simply indicates that such territory *must* be served by him—not necessarily connoting an exclusive territory. And while the pleaded contract contains a blank line for insertion of the wholesale price which the dealer must pay to Times Herald for his papers, it does not mention or refer to any other price, either the price that the dealer may charge his carriers or that to be charged the reader. The contract therefore does not reasonably lend itself to any construction of "price fixing"; and on both counts the petition fails to raise any issue of law violation.

■■ Even assuming an aspect of illegality relative to the contracts in question, appellant is in no position to invoke it. To recover in tort for damages caused by a trust, combination or conspiracy, one must be as an "innocent" third party—not as a late participant in such combination—claiming injury now that he has been excluded from its membership. 29 Tex. Jur., pp. 771–2; 25 Tex.Law Review 31. " * * * 'courts, as the best means of discouraging such (illegal) acts, have generally adopted the rule that the parties shall not receive affirmative aid to extricate themselves from difficulties in which, by their unlawful conduct, they have involved themselves, but shall be left as they are found. This principle does not recognize in either party the better right under the void undertaking, but treats a plaintiff who thus shows himself to be equally guilty with his adversary as not deserving the relief sought from the court.' Olcott v. International & G. N. R. Co. [Tex.Civ. App.] 28 S.W. 728. 'Where two persons guilty of participation in an unlawful transaction are in pari delicto, as in this case, neither a court of law nor a court of equity will aid either to recover or reinvest himself with any title or interest which he, in consideration of such unlawful contract, has vested in the other, but will leave them in the same condition as to vested interests as they by their own acts have placed themselves.' Beer v. Landman, 88 Tex. 450, 31 S.W. 805. * * *" Eckles v. Nowlin, Tex.Civ.App., 158 S.W. 794, 795. Appellant's true situation under the allegations made is aptly portrayed by counsel for appellee in the following: His sole grievance "is that the Herald discontinued selling newspapers to him and he seeks damages because of that discontinuance. He is not an 'innocent' third party who has

been injured by the action of conspiring strangers; on the contrary, he was, until his contract was cancelled, a party to the distribution system of which he now complains. He admits that his contract with the Herald was validly terminated. He has sought by this action either to force the Herald to resume selling him papers or to penalize it for failure to do so. The law does not permit him to use the anti-trust statutes for such purpose."

The judgment of dismissal is accordingly affirmed.