Jerry CRANFILL, et al.

v.

The SCOTT & FETZER
COMPANY, et al.

No. S–82–181–CA.

United States District Court,
E.D. Texas,
Sherman Division.

May 9, 1991.

Roger D. Sanders, Sherman, Tex., for plaintiffs.

Barry L. Springel, John R. Henderson, Jones, Day, Reavis & Pogue, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

COBB, District Judge.

### I. INTRODUCTION

In 1979, plaintiff Jerry Cranfill was a distributor for the defendant The Scott Fetzer Company,[1] and specifically for The Kirby Company Division of The Scott Fetzer Company ("Kirby"). In her deposition testimony, Jerry Cranfill admitted that in 1979, in direct violation of her Distribution Agreement, she submitted false sales and warranty information to Kirby (Cranfill Depo., p. 52). In December 1979, pursuant to the Distributor Agreement between Kirby and plaintiffs, Kirby cancelled Jerry Cranfill's distributorship for false reporting.

Jerry Cranfill and her husband Miller Cranfill then filed this action, claiming, in essence, that Kirby's cancellation of the Cranfill distributorship was not motivated by a legitimate purpose (termination for false reporting). Instead, plaintiffs claim Kirby's actions were "in retaliation" for plaintiffs' alleged failure to abide by purported Kirby policies relating to price maintenance or price advertising. Plaintiffs also claim that Kirby's action was "in retaliation" for plaintiffs' failure to abide by an alleged territorial restriction, called the Installation, Service and Administration (ISA) fee. In addition, plaintiffs claim that in retaliation for plaintiffs' failure to abide by Kirby's allegedly anticompetitive policies, Kirby and others conspired and refused to deal with the plaintiffs after their Kirby distributorship was cancelled.

Plaintiffs have combined the above allegations in an attempt to state claims under the Sherman Act (Counts I, II, III, IV and V of the Plaintiffs' Second Amended Original Complaint. (Am.Compl.)), the Texas antitrust statute in existence before 1983

1. The Scott Fetzer company was formerly known as the Scott & Fetzer Company.

(Am.Compl. Count VI), and under Texas common law (Am.Compl. Count VII).

### THE FACTS OF THE CASE

#### A. *The Kirby Business*

The defendants in this case are The Scott Fetzer Company ("Scott Fetzer") and The Kirby Sales Company. Scott Fetzer has a division called the Kirby Company. The Kirby Sales Company is a wholly owned subsidiary of Scott Fetzer. The Kirby Sales Company has done business exclusively in the State of Texas since the middle of 1980. Both the Kirby Company Division and the Kirby Sales Company are in the business of manufacturing and selling vacuum cleaners and accessories throughout the United States and around the world. Of the eleven major sellers of vacuum cleaners in the United States and around the world, Kirby ranks fifth. Further, Kirby's market share of all vacuums sold in the United States at all relevant times has been approximately six to eight percent. (Affidavit of Marshall R. Herron (Herron) at para. 1, 2).[2]

Traditionally, Kirby has not and did not directly market its products to end users. Rather, Kirby contracted with numerous distributors who, in turn, marketed Kirby products. The distributors were not employed by Kirby. For the most part, the relationship between Kirby and the distributor was that of vendor and vendee. Distributors could sell Kirby products directly to end users or could contract with dealers who would then sell products to customers. The distributor-dealer relationship was also

that of a vendor and vendee. (Herron at para. 3).[3]

Beginning in 1978, each distributor was assigned an "area of primary responsibility" which could overlap with another distributor's area. Distributors were free to sell outside of their area. Distributors do, in fact, sell products outside of their areas (Herron at para. 4).

##### 1. The Importance of In-Home Sales to Kirby

Kirby believes a Kirby vacuum cleaner has a number of unique features which may not be readily apparent from merely viewing the product. For example, Kirby vacuum cleaners may be used with a variety of accessories and attachments which do more than merely vacuum rugs or carpets. Because of this unique aspect of Kirby products, Kirby has determined that Kirby products should be sold by in-home sales demonstrations. Because Kirby believes in-home demonstrations are essential, it required that each distributor with which Kirby contracts make a commitment to build and maintain an in-home sales force. (Herron at para. 6).

Kirby had traditionally published a suggested retail price for its products. Kirby had also advised distributors that prices for Kirby products should permit the distributor to make a profit so that the distributor could stay in business. Ultimately, however, the price for which a distributor or dealer sells a Kirby product was left to the determination of the distributor or dealer. (Herron at para. 7; Affidavit of Adrian E. Budlong, Jr. (Budlong) at para. 4;[4] Affidavit of Peter B. Menke (Menke) at para. 4[5]).

---

**2.** Marshall R. Herron is Director, Sales Administration for Kirby.

**3.** Beginning sometime around the middle of 1980, Scott Fetzer formed the Kirby Sales Company to conduct business in the State of Texas. Rather than selling Kirby products to distributors who then sold those products to dealers or customers, the Kirby Sales Company distributed products by consignment. Each Kirby distributor in Texas signed a Consignment Agreement with the Kirby Sales Company and the Kirby Sales Company would be the sole source of new Kirby products, accessories and parts for the distributor. (Herron at para. 12–13).

**4.** Adrian E. Budlong, Jr. was a Kirby distributor, National Sales Manager, Vice President-Sales and, ultimately, President of Kirby. He was President of Kirby from 1972 to 1979. He is currently under contract with Kirby as a Divisional Supervisor. (Budlong at para. 1).

**5.** Peter B. Menke has been under contract as a Divisional Supervisor and was employed as Assistant to the President of Kirby and as Vice President-Sales from 1975 to 1981. (Menke at para. 1).

## 2. Kirby's Distributor Agreement

In 1978, Kirby instituted a program called the Installation Service and Administration (or "ISA") fee. The ISA fee became part of every Kirby Distributor Agreement. The ISA program generally worked as follows. For every Kirby vacuum cleaner sold to a distributor, Kirby would charge an additional $38.00 as an ISA fee. If the distributor sold that product within the distributor's "area of primary responsibility" (a geographic area defined in the distributor's agreement) and if the distributor turned in both a sales report form including that sale and a properly completed warranty card completed by the distributor and the customer, Kirby would return the $38.00 ISA fee plus a $2.00 sales producer dividend plan ("SPDP") fee to the distributor. If the distributor sold the product outside the distributor's "area of primary responsibility," then the distributor with an office deemed to be closest to the customer would receive $30.00.[6] To receive the $30.00, the non-selling distributor was required to contact the customer, verify that the customer had received the demonstration of the product (and demonstrate the product if a demonstration had not been given) and provide any necessary service for that product. (Herron at para. 9).

The ISA program had several purposes. First, the program was designed to ensure that every end user-purchaser of a Kirby product received a demonstration of the product. Second, the ISA program created an incentive for distributors to build an in-home sales force concentrated within the distributor's "area of primary responsibility." Third, and perhaps most important, the ISA program assured that customers purchasing Kirby products would receive adequate service from authorized Kirby distributors. The ISA program attempted to compensate those distributors who would be responsible for providing warranty service for Kirby products. Fourth, the ISA program—and particularly the requirement of a completed and accurate customer and warranty information—provided Kirby with a data base which Kirby could use for product warranty and recall purposes, and for marketing purposes generally (Herron at para. 10; Budlong at para. 6). Kirby included a provision in its 1978 Distributor Agreement which required the distributor to provide such information accurately and which specifically made failure to adhere to this requirement cause for cancellation of the distributor's agreement. (Herron at para. 11).

### B. *Plaintiffs' Dealings with Kirby*

Plaintiff Jerry Cranfill became involved in the Kirby business in the 1960s (Am. Compl. para. VI). Mrs. Cranfill's distributorship, which may or may not have been owned jointly with her husband, plaintiff Miller Cranfill (Deposition and Answers of Jerry L. Cranfill), entered into a series of distributorship agreements with Kirby. The last agreement was signed in 1978 (Am.Compl. para. VI).

Plaintiff's area of primary responsibility included a multi-county area which included and surrounded Sherman, Texas (Am. Compl. para. V). However, plaintiffs sold Kirby products outside of their area of primary responsibility. Plaintiffs encountered competition both inside and outside of their area of primary responsibility. For example, Jerry Cranfill admitted that Kirby products competed with at least five other brands of vacuum cleaners that were available to customers in the area where she was selling (*Id.* at 13–14). She testified, "There's lots of people in town that sell vacuum cleaners." (*Id.* at 14).

Plaintiffs operated their business as a business independent of Kirby. For example, plaintiffs were the only ones that could set what prices they charge. As Jerry Cranfill testified:

Q. Now as to sales that you personally made ..., you set your own price?

A. On the machines I sold myself?

Q. Yes.

(Affidavit of Jerry Cranfill ("Cranfill") at para. 13).

---

**6.** Plaintiffs alleged $38.00 would be returned, but Jerry Cranfill has since amended that allegation, and agrees $30.00 is the correct amount.

A. Yes.

Q. You charged whatever you wanted to charge?

A. I charge whatever I had to charge to make a profit, yes.

(Cranfill Depo. at 44). Further, in reports that Jerry Cranfill mailed to plaintiffs for twenty years, Kirby never sought any information on the prices that plaintiffs charged to customers (*Id.* at 41). Indeed, Jerry Cranfill had no recollection of ever telling anyone at Kirby what prices she charged (*Id.* at 42).

In late 1979, Kirby personnel, in the regular course of Kirby's business, sought to verify sales reports filed by Jerry Cranfill. Such verifications were done on a random basis. Kirby discovered several errors in Cranfill's sales reports. In November 1979, Kirby determined that Jerry Cranfill was sending false warranty information in reports to Kirby (Herron at para. 16). On December 13, 1979, Kirby cancelled plaintiffs' Distributor Agreement for furnishing incorrect sales reports and warranty information (*Id.*).

### C. *Plaintiffs' Claims*

Plaintiffs' claims boil down to these propositions: (a) Kirby imposed an installation, service and administration fee which allegedly restricted the territory in which plaintiffs could sell their products (Am.Compl. para. VII, XXII); (b) Kirby cancelled plaintiffs' Distributor Agreement because of plaintiffs' alleged failure to comply with the ISA program and with an alleged pricing program (*id.* para. VII, VIII); and (c) for the same reasons, Kirby allegedly refused to deal with plaintiffs after plaintiffs' distributorship was cancelled (*Id.* para. VII, XII, XVIII).

#### 1. Plaintiffs' "price" claims

When asked to explain her allegations with respect to price, plaintiff Jerry Cranfill testified as follows:

Q. Can you explin [sic] to me in your own words what that claim pertains to?

A. Well, I'm not an attorney, but it means that we had to adhere to cer-

tain prices, and if we didn't, we were in trouble, which interfered with me being an independent person.

Q. Is that what that claim deals with?

A. In part, I would guess.

\*　　\*　　\*　　\*　　\*　　\*

Q. What prices did you adhere to? I thought you told me you charged whatever you wanted to charge.

A. Whenever you advertise a Kirby for sale, if it is at a price beneath what the Kirby Company thinks you should sell it for, they make you take your ads out of the paper.

Q. Is that what this whole claim pertains to, the ads that you had to take out of the paper?

\*　　\*　　\*　　\*　　\*　　\*

A. No, not the whole claim.

Q. What else does it pertain to other than advertising?

A. Restricting my trade.

Q. How?

A. By not being able to advertise.

(Cranfill Depo. at 103–104). Further, in her deposition, Jerry Cranfill stated that she was told not to advertise by Divisional Supervisor R. J. Sperry (*Id.* at 107).

#### 2. Plaintiffs' "Refusal to Deal" Claims

Plaintiffs' claims about the alleged refusal to deal with plaintiffs involves plaintiffs' attempt to become dealers for three Kirby distributors: Irene Sperry, Roy Baker and Ted Fite. The record evidence regarding plaintiffs' and Kirby's dealings with these distributors is as follows.

##### a. *Irene Sperry*

After her Kirby distributorship was cancelled, Jerry Cranfill first bought Kirby products from Irene Sperry, who was then a Kirby distributor in McKinney, Texas (Cranfill Depo. at 140; Herron at para. 19). Jerry Cranfill testified that she was subsequently told by Irene Sperry that someone had called Ms. Sperry and had told Mrs. Sperry not to deal with Mrs. Cranfill (Cranfill Depo. at 140, 154).

In 1980, the question of whether Irene Sperry could sell to Jerry Cranfill was

brought to the attention of Kirby management. Specifically, this issue was raised by Divisional Supervisor R.J. Sperry with Peter Menke, Kirby Vice President–Sales. The affidavits of Irene Sperry and Menke conflict regarding whether Menke told Sperry not to sell to the plaintiffs.

### b. *Roy Baker*

After Irene Sperry declined to deal with plaintiffs, plaintiffs turned to Roy Baker, who was a Kirby distributor in Idabel, Oklahoma (Cranfill Depo. at 140. *See* Herron at para. 20.) In her deposition, Jerry Cranfill claimed that Kirby cancelled Mr. Baker's distributorship because Baker had dealt with the plaintiffs (Cranfill Depo. at 140). Kirby claims the distributorship was cancelled for filing false sales reports and warranty information. (Herron at para. 20).

### c. *Ted Fite*

After Mr. Baker's distributorship was cancelled, plaintiffs began to purchase Kirby products from Ted Fite, a Kirby distributor in Ardmore, Oklahoma (Cranfill Depo. at 140; Herron at para. 21). In her deposition, Jerry Cranfill claimed that after selling her some Kirby vacuum cleaners, Mr. Fite told her that Curtis Meador told Mr. Fite that he could not sell to plaintiffs (Cranfill Depo. at 140). However, Mr. Meador denies that he ever told anyone not to deal with plaintiffs. When Jerry Cranfill approached Mr. Meador regarding whether she could purchase Kirby products from him, Mr. Meador claims he answered affirmatively. (Meador at para. 5).

After Mr. Fite broke off his relationship with plaintiffs, plaintiffs did not attempt to deal with any other Kirby distributor (Cranfill Depo. at 155).

### III. THE APPLICABLE LAW

■ Rule 56 of the Federal Rules of Civil Procedure states that summary judgment should be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that summary judgment is appropriate in antitrust cases where a plaintiff is unable to produce "significant probative evidence" to support the bare allegations in its complaint. *First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). *See also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiffs "may not rest upon the mere allegations or denials of [their] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510 (quoting *First National Bank of Arizona,* 391 U.S. at 288–89, 88 S.Ct. at 1592–93).

### COUNTS I, II, III, AND IV

Plaintiffs' federal antitrust claims fail for two reasons. First, plaintiffs have produced no evidence showing Kirby had any agreement with anyone to set the price at which plaintiffs or any other distributor should sell Kirby products. As Jerry Cranfill admitted, distributors—including plaintiffs—were free to charge any price they wanted (Cranfill Depo. at 44). Second, plaintiffs have produced no evidence showing Kirby's alleged conduct has any adverse effect in any relevant market. As Jerry Cranfill conceded, competition in the sale of vacuum cleaners is intense and many suppliers compete in that business. Kirby's share of the vacuum cleaner business (however the market is defined) is quite small. Because there is no evidence that Kirby fixed prices or that Kirby has any market power, summary judgment is required, as a matter of law, on Counts I, II, III, and IV.[7]

---

7. As discussed below, the lack of significant probative evidence required to avoid summary judgment is particularly telling in view of the independent grounds, admitted by Jerry Cranfill, to support termination of the parties' relationship. *See Paul Kadair, Inc. v. Sony Corp. of America,* 694 F.2d 1017 (5th Cir.1983) (no facts to support conspiracy claims put forth after defendants showed independent business reasons for refusal to deal); *see also Landmark*

### 1. Applicable Legal Principles

■ Section 1 of the Sherman Act, 5 U.S.C. § 1, prohibits conspiracies that unreasonably restrain trade.[8] *See, e.g., Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). The "rule of reason" is the prevailing standard of analysis. *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 24–25, 99 S.Ct. 1551, 1564–65, 60 L.Ed.2d 1 (1979); *Business Electronics,* 485 U.S. at 723–24, 108 S.Ct. at 1519–20. It requires

> the factfinder [to weigh] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on trade.

*Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

■ The courts have identified limited types of conduct as *per se* illegal. *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717 at 723–24, 108 S.Ct. 1515 at 1519–20, 99 L.Ed.2d 808 (1988). Characterization as *per se* obviates the need to show the reasonableness of the conduct in a particular case. *Sports Center, Inc. v. Riddell, Inc.,* 673 F.2d 786, 790 (5th Cir.1982). *Per se* rules are appropriate only for conduct "that would always or almost always tend to restrict competition and decrease output." *Broadcast Music Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979).

In Plaintiffs' Second Amended Original Complaint, the only *per se* conduct that plaintiffs allege is resale price maintenance, or vertical price fixing, *i.e.,* an alleged agreement between Kirby and its distributors to fix resale prices. *See Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. at 732–34, 108 S.Ct. at 1523–24.[9]

### 2. Kirby Has Engaged in No *Per Se* Illegal Activity

■ Liberally construing Plaintiff's Second Amended Original Complaint, plaintiffs essentially make only one allegation even remotely related to price, *i.e.,* that Kirby has "restrict[ed] price competition among dealers and distributors" (Am.Compl. para. VII). Coupled with this allegation, plaintiffs also assert that Kirby retaliated against plaintiffs for failing to adhere to Kirby's alleged pricing policies (*id.*) and that Kirby conspired with others in refusing to deal with plaintiffs "as a part of Defendants [sic], one or both, price-fixing scheme." (*Id.* para. XII)

When asked to explain her price allegation in her deposition,[10] Jerry Cranfill testified that her claim related solely to her alleged inability to place advertisements

---

*Development Corp. v. Chambers Corp.,* 752 F.2d 369, 371 (9th Cir.1985) (defendant terminated distributor for fraudulent purchase practices; "[t]he undisputed proof of this legitimate business reason was sufficient to preclude an inference of a vertical price-maintenance conspiracy from the refusal to sell to Landmark alone, and to impose upon plaintiffs the burden of advancing additional specific evidence of such a conspiracy"); *Program Engineering, Inc. v. Triangle Publications, Inc.,* 634 F.2d 1188, 1195 (9th Cir. 1980) (once defendant shows legitimate business reasons for its conduct, "plaintiff must come forward with specific factual support for its allegations").

**8.** The statute reaches only conspiracies; unilateral action, regardless of its effect, does not violate Section 1. *See Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Consequently, to the extent plaintiffs' claims deal with Kirby's unilateral action (*see* Am.Compl. para. XII

(unilateral refusal to deal); Am.Compl. XXVIII; Cranfill Depo. at 81 (ISA fee "imposed" on distributors)), such claims are dismissed as a matter of law.

**9.** Plaintiffs assert in a general way that Kirby engaged in a *per se* group boycott, apparently to fix resale prices. (Am.Compl. para. XVII) Group boycotts, however, are only *per se* illegal if they involve an agreement among two or more traders at the same level in the market place. *Davis–Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1198–99 (6th Cir.1982), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984). Here, there is no specific allegation and no evidence to support such a horizontal claim. *See* note 14 *infra.*

**10.** In her deposition, plaintiff Jerry Cranfill was actually asked about Count II of the plaintiff's original complaint. That Count, however, is merely repeated in Count I of the plaintiff's second amended complaint.

which included the price for Kirby products (Cranfill depo. at 103–104). Jerry Cranfill's version of the facts, even if true, do not support a claim for vertical price fixing. The Fifth Circuit, in *In Re Nissan Antitrust Litigation*, 577 F.2d 910 (5th Cir. 1978), *cert. denied sub nom P.D.Q. Inc. v. Nissan Motor Corp.*, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979), has held that an automobile manufacturer's action, which prohibited certain types of dealer advertising that included prices below the suggested manufacturer's price, was not *per se* illegal in the absence of other evidence of an agreement to fix prices. (*Id.* at 916). Here, as in *Nissan*, there is no evidence of an agreement to fix prices. Any restraint on plaintiffs' advertising activities, in and of itself, is not evidence of such an agreement.

In her deposition, Jerry Cranfill agreed that she could charge any price for a Kirby product that she wanted to (Cranfill Depo. at 44).[11] So, too, in reports that Jerry Cranfill mailed to Kirby for twenty years, Kirby never sought any information on the prices that she charged to customers (Id. at 41). Cranfill had no recollection of ever telling anyone at Kirby what prices she charged (*Id.* at 42). There is no evidence of any agreement between Kirby and any distributor to set plaintiffs' resale prices.[12]

3. Plaintiffs' Allegations Regarding Kirby's Nonprice Activities Are Not Unlawful Under the Sherman Act.

Apart from the alleged pricing conduct, plaintiffs' antitrust claims boil down to these:

a. That Kirby imposed an Installation, Service and Administration ("ISA") fee which restricted the territory in which plaintiffs could sell their products (Am.Compl. para VI, XXII, XXXII);

b. That Kirby terminated plaintiffs' distributorship because of plaintiffs' failure to comply with the ISA program and with an alleged pricing program (*id.* para. VI, VII, XII); and

c. That, for the same reasons, Kirby refused to deal with plaintiffs after plaintiffs' distributorship was terminated. (*Id.*)

These claims also fail.

a. *The ISA Program*

■ The ISA program instituted by Kirby in 1978 is included in every Kirby distributor agreement. The ISA serves as an incentive for distributors to sell within their areas with the benefit to Kirby of ensuring complete market penetration of in-home sales (Herron at para. 10). The ISA program also ensured that purchasers of Kirby products would receive proper service, especially with respect to warranty or recall matters (*Id.;* Budlong at para. 6).

The practice of assigning areas of primary responsibility to distributors has been regularly upheld, especially when, as here, nothing prohibits the distributors from selling outside their areas. *See, e.g., Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 572–73 (5th Cir.1978), *cert. denied* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); *Dart Industries, Inc. v. Plunkett Co. of Oklahoma*, 704 F.2d 496, 499 (10th Cir.1983); *Kaiser v. General Motors Corp.*, 396 F.Supp. 33, 39–40 (E.D.Pa.1975), *aff'd. mem.*, 530 F.2d 964 (3d Cir.1976); *Colorado Pump & Supply Co. v. Febco, Inc.*, 472 F.2d 637, 639 (10th Cir.), *cert. denied*, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973). Similarly, programs like the ISA fee, called "profit passovers", have also been upheld. *Superior Bedding Co. v. Serta Associates, Inc.*, 353 F.Supp. 1143, 1150–51 (N.D.Ill.1972).

**11.** *Cf. AAA Liquors, Inc. v. Joseph E. Seagram & Sons*, 705 F.2d 1203, 1207 (10th Cir.1982), *cert. denied*, 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983) (no claim for vertical price fixing where dealers maintained control).

**12.** Because there was no such agreement, plaintiffs cannot support a *per se* claim merely because of their alleged termination and any alleged retaliation thereafter. *Business Electronics Corp. v. Sharp Electronics, Inc.*, 485 U.S. 717, 735–36, 108 S.Ct. 1515, 1525–26, 99 L.Ed.2d 808 (1988) ("a vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels").

952

**b.** *Plaintiffs' Vertical Restraint Claims Fail Because Kirby Has No Market Power*

 The alleged practices that plaintiffs attack—relating to both ISA and price advertising—at most, constitute vertical nonprice restraints. Such restraints derive their name because they "are imposed by persons or firms further up the chain of distribution of a specific product ... than the enterprise restrained." *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir.1981). As the Fifth Circuit has stated, "[u]nless decidedly unreasonable, vertical restrictions upon product distribution are permissible and even desirable." *Sports Center, Inc. v. Riddell, Inc.*, 673 F.2d 786, 791 (5th Cir.1982).[13]

 In *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 295 (5th Cir.1981), the court articulated this standard for reviewing the propriety of vertical restraints:

Vertical non-price restraints are tested under the rule of reason; that is, the plaintiff must prove that the restraint had an anticompetitive effect in the relevant market in order to prevail.

*Sports Center, Inc. v. Riddell, Inc.*, 673 F.2d 786, 790 (5th Cir.1982); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005 (5th Cir.), *cert. denied sub nom. Red Diamond Supply, Inc. v. Acme Welding & Supply, Inc.*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981).

Thus, an antitrust plaintiff seeking to attack nonprice vertical restraints *must* show an anticompetitive effect in order to prevail. *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d at 297. Without demonstrating an effect on competition, there is no violation of antitrust law "even if [the plaintiff] proved a conspiracy to eliminate it from the market," or even if the plaintiff proved that the defendant acted with "unlawful intent" or used "unfair methods of competition." *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 245, 246 (5th Cir.1978); see *Daniels v. All Steel Equipment, Inc.*, 590 F.2d 111, 113 (5th Cir.1979) (requiring "a showing of adverse market impact even though the defendants may have engaged in questionable business practices and a competitor was eliminated").

 Because an antitrust plaintiff must prove that the defendant's conduct is anticompetitive, actions taken by a manufacturer in restricting distribution of its products do not violate the antitrust laws so long as interbrand competition acts as a "significant check on the exploitation of intrabrand market power." *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d at 297.[14] Thus, in *Muenster Butane, Inc. v. Stewart Co.*, 651

---

**13.** Although plaintiffs have alleged that some of Kirby's conduct involved a "horizontal conspiracy" (Am.Compl. para. XXI), alleged conspiracies between a manufacturer and its distributors are only treated as a horizontal when the source of the alleged conspiracy is a combination of the distributors. *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004 (5th Cir.), *cert. denied sub nom. Red Diamond Supply, Inc. v. Acme Welding & Supply Inc.*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981) (quoting *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 245 (5th Cir.1978)); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 297 (5th Cir.1981). On the other hand, "[w]hen the manufacturer is the source, the conspiracy is vertical." *Red Diamond Supply, supra*, 637 F.2d at 1004 (citing *United States v. Arnold Schwinn & Co.*, 388 U.S. 365, 372, 87 S.Ct. 1856, 1862, 18 L.Ed.2d 1249 (1967)).

Here, there is no evidence of any contact between distributors or dealers to support a

conspiracy claim. According to Jerry Cranfill, it was Kirby that forced distributors not to deal with her. *See generally Parsons v. Ford Motor Co.*, 669 F.2d 308 (5th Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982) (Ford had policy prohibiting dealers from selling to non-franchised dealers called bootleggers; plaintiff was terminated because he fraudulently asserted he was a fleet purchaser and not a bootlegger, and summary judgment dismissing his antitrust claim was upheld where Ford and its dealers took steps against him).

**14.** *See also Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005 (5th Cir.), *cert. denied sub nom. Red Diamond Supply, Inc. v. Acme Welding & Supply Inc.*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981); *Daniels v. All Steel Equipment, Inc.*, 590 F.2d 111, 113 (5th Cir.1979); *H & B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 246 (5th Cir.1978).

F.2d 292, 297 (5th Cir.1981), the court reasoned:

> [E]ven if a conspiracy between a supplier and its distributor to put a second distributor out of business were proven, the supplier would not have violated the antitrust laws. Any reduction in intraband competition would have, at most, a de minimus effect on the "healthy" interbrand rivalry from other dealers.

■ The determination of whether the necessary intraband competition exists focuses upon whether the defendant has "substantial" market power. Indeed, as the *Muenster Butane* court noted, this inquiry "should be a preliminary hurdle in all restricted distribution (vertical restraint) cases." *Id.* at 298. This inquiry is relevant because "if a firm lacks market power, it cannot affect the price of its product and thus any vertical restraint could not be anticompetitive at the interbrand level." *Id.* The effect on interbrand competition, in fact, is "the primary concern of antitrust law." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. at 52, n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977).

The evidence of record demonstrates that there was intense interbrand competition. Jerry Cranfill herself admitted that Kirby products competed with at least five other brands of vacuum cleaners that were available to consumers in the area where she was selling (Cranfill depo. at 13–14). Indeed, she testified, "There's lots of people in town that sell vacuum cleaners." (*Id.* at 14). *See Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1005 (5th Cir.), *cert. denied sub nom. Red Diamond Supply, Inc. v. Acme Welding & Supply, Inc.,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981) (seven other manufacturers and other distributors existed: "[t]hese facts are strongly indicative of a competitive market, and there is little in the record suggesting the contrary"); *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 298 (5th Cir.1981) ("Where, as in this case, interbrand competition was still vigorous, termination of a dealer is insufficient to support a Sherman Act violation"); *Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111, 113 (5th Cir.1979) (summary judgment appropriate where the plaintiff in deposition conceded that there was vigorous interbrand competition).

■ Whether the defendant has market power and whether the defendant's vertical restraints are therefore without anticompetitive effects can also be determined by evidence of other market conditions, including evidence of the defendant's market share. *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 298 (5th Cir.1981); *Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83, 85, 90 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979).

■ Here, Kirby sold between six and eight percent of all vacuum cleaners sold in the United States (Herron at para. 2). Kirby ranks fifth of the eleven major vacuum cleaner manufacturers in the United States (*Id.*). That is not enough to raise a triable issue on plaintiffs' vertical claims. Kirby's share of the vacuum cleaner business is less than the market shares of defendants in other cases where courts held no market power existed. *E.g., Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 318–19 (8th Cir.1986) (summary judgment granted; defendant had a market share of 19.1 percent); *Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83 (5th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979) (summary judgment granted; defendant, the number two seller, faced eight competitors and had a twenty-five percent national market share).

■ Plaintiffs' federal antitrust claims are fatally defective as a matter of law. No *per se* claim can proceed because there is no evidence of any agreement regarding price. Plaintiffs' other federal antitrust claims must be dismissed because of the presence of interbrand competition and because of Kirby's lack of market power.

## COUNT VI

■ Count VI of plaintiffs' second amended original complaint recites prohibited conduct set forth in former Section

15.02 and 15.03 of the Texas Business & Commerce Code and alleges that Kirby did these things.[15] Count VI contains "nothing more than generalities and conclusions that fall far short of the established rule that [antitrust allegations] be made with the same degree of certainty that is required with criminal cases." *Sessions Co. v. W.A. Sheaffer Pen Co.*, 344 S.W.2d 180, 183 (Tex.Civ.App.—Dallas 1961, writ ref'd n.r.e.) (citing *Ford Motor Co. v. State*, 142 Tex. 5, 175 S.W.2d 230 (1943)).

■ However, assuming *arguendo* plaintiffs intended to base their Texas statutory antitrust claim on the same alleged conduct which plaintiffs alleged for their federal antitrust claims, *i.e.*, (1) that the ISA provision in Kirby's Distributor Agreement somehow restrained trade; (2) that Kirby required retail prices; and (3) that Kirby and others refused to deal with the plaintiffs, the court finds summary judgment is appropriate on these claims. None of these allegations supports a claim under the pre–1983 Texas Antitrust Statute.

### 1. The ISA Provisions in Kirby's Distributor Agreement Did Not Violate Texas Law

■ As discussed above, Kirby's ISA fee provided incentives for sales and service with reference to a distributor's area of primary responsibility. Count VI of the Second Amended Original Complaint attempts to claim that Kirby's Distributor Agreement violated Texas law either because it provided plaintiffs with an exclusive territory or because the ISA provisions somehow restrained trade. Notably, even if the Kirby Distributorship Agreement did establish an exclusive territory for plaintiffs or even if the ISA program somehow restrained trade, plaintiffs' supposed causes of action based on such allegations must fail. As former participants in the alleged illegal activity, plaintiffs cannot now claim injury due to exclusion therefrom. *Erickson v. Times Herald Printing Co.*, 271 S.W.2d 329, 332 (Tex.Civ.App.— Dallas 1954, writ ref'd n.r.e.); *Jax Beer Co. v. Palmer*, 150 S.W.2d 452, 454 (Tex.Civ. App.—Fort Worth 1941, no writ history).

As a factual matter, however, the Kirby Distributor Agreement did not provide plaintiffs with an exclusive territory. The 1978 Agreement provided plaintiffs with an "Area of Primary Responsibility." Plaintiffs were free to sell Kirby products outside of this area; and they did (Herron at para. 10; Cranfill Depo. at 83–85). Further, there were other Kirby distributors located in the same area (Am.Compl. para. VI; Cranfill Depo. at 116–117). Thus, the area of primary responsibility was in no way exclusive to anyone.

■ The mere fact that Kirby's Distributor Agreement mentioned a geographic area does not mean that it violated Texas Antitrust law. For example, in *Erickson v. Times Herald Printing Co.*, 271 S.W.2d 329 (Tex.Civ.App.—Dallas 1954, writ ref'd n.r.e.), a newspaper distributor brought an antitrust action against a newspaper company. The plaintiff challenged, among other things, the fact that the newspaper's contract required the plaintiff to make deliveries in a specified territory. Rejecting this as a basis for a violation of the Texas

---

**15.** Former Section 15.02 defined a "trust" to include a combination of two or more persons to, *inter alia:*

(1) restrict, or tend to restrict, trace, commerce ...; or

(2) fix, maintain, increase, or reduce the price of tangible personal property ...; or

(3) prevent or lessen competition ...; or

(4) affect, control, or establish the price of tangible personal property ...; or

(5) agree

(A) not to sell, dispose of ... tangible personal property ... at a price below a common standard or figure;

(B) to maintain the price of personal property ... at a fixed or graded figure;

(C) to affect or maintain the price of tangible personal property ... in order to preclude free competition between or among themselves or others....

Former Section 15.03 provided:

(A) It is a conspiracy in restraint of trade for

(1) two or more persons engaged in buying or selling tangible personal property to agree not to buy from or sell to another person tangible personal property;

(2) two or more persons to agree to boycott, or threaten not to buy or sell to, a person because that person buys from or sells to another person; ...

antitrust statute, the *Erickson* court stated:

> The designation of a specific territory to a named dealer, as the contract provides, though an obvious requirement for securing to a defendant's paper a complete coverage in a given area, simply indicates that such territory *must* be served by him—not necessarily connoting an exclusive territory. And while the pleaded contract contains a blank line for insertion of the wholesale price which the dealer must pay to Times Herald for his papers, it does not mention or refer to any other price, either the price that the dealer may charge his carriers or that to be charged the reader. The contract therefore does not reasonably lend itself to any construction of "price fixing"; and on both counts the petition fails to raise any issue of law violation.

*Id.* at 332.

■ It is also legitimate for a manufacturer to attempt to ensure adequate coverage of a particular area by assigning areas of primary responsibility to its distributors. *O'Neil v. Mack Trucks, Inc.*, 533 S.W.2d 832, 836 (Tex.Civ.App.—El Paso 1975) *rev'd on other grounds*, 542 S.W.2d 112 (1976), *recalled*, 551 S.W.2d 32 (1977).

■ Moreover, apart from any discussion of alleged geographic limitations on plaintiffs' activities, service fee sharing agreements, like the ISA here, have been specifically held *not* to violate Texas antitrust law. In *Ford Motor Co. v. State*, 142 Tex. 5, 175 S.W.2d 230 (1943), the Texas Supreme Court discussed a contract between Ford and a Ford dealer which contained provisions similar to the ISA provision in the Kirby Distributor Agreement. In the Ford contract, a dealer, who sold a new car to a buyer who resided in another municipality where another Ford dealer or authorized Ford service provider was located, was required to pay the other dealer or service provider thirty dollars as a "service commission."

The *Ford* court initially observed two maxims of then-existing Texas law:

> It is a violation of our antitrust laws for one part to enter into a contract with another party, whereby it is agreed that goods or products sold by the one party to the other party, for resale in this State, shall be resold only in a restricted territory in this State.
>
> Any intentional course of conduct by the parties to a contract which accomplishes the result of enabling the seller to dictate or control the resale price of goods or products sold by him for resale in Texas, or which enables the seller to cause the purchaser to confine his resales to a restricted territory in this State, or which otherwise accomplishes results prohibited by our antitrust laws, violates the same.

*Id.* 175 S.W.2d at 233 (citations omitted).

Looking to the service fee provision of the Ford contract, the court observed:

> We are of the opinion that the above-quoted service charge provision, as contained in this section of this contract, on its face, discloses no violation of our antitrust laws. Such provision, on its face discloses no intention on the part of Ford or its dealers to restrict Ford dealers to any defined territory in the sale of Ford products. Under the provisions of this contract all dealers appears to be on an absolute equality, and all assume the same obligation. For aught that is disclosed on the face of the contract, the service charge is fair and worth the amount provided for. Ford is vitally interested in satisfied customers. In order to obtain such it is necessary for Ford products to properly perform through years of service. The way in which a new car is broken in has a permanent effect on its future performance and the length of time it will last. In order to obtain such result Ford requires its dealers to provide certain service for new cars, without extra cost. It is reasonably necessary for this service to be made convenient to the purchasers of new cars, so that they will avail themselves of it. Finally, the contract does not show the kind, quality, extent, or value of such service, and in the absence of such showing it cannot be said that it, the contract,

shows any illegality or ulterior motive on its face.

*Id.* at 236.

Kirby's ISA serves a purpose similar to the Ford service charge clause. Like Ford, Kirby was—and is—"vitally interested in satisfied customers." Like Ford products, Kirby's products need to be serviced. Kirby, like Ford, requires distributors to provide certain service on its new products at no charge to the buyer. As with Ford, Kirby's warranty is only of use and value if the customer will take advantage of it and thus it is necessary that service be convenient for the customer. Like Ford's service charge, Kirby's ISA fee is imposed uniformly on all distributors if they sell products which will be served by others. Like the Ford contract, the Kirby ISA provision does not show "any illegality or ulterior motive on its face." The ISA fee cannot, therefore, form the basis of plaintiffs' allegations of violation of the pre–1983 Texas Antitrust Statute by Kirby.

### 2. There Was No Agreement to Fix Prices

In their Second Amended Original Complaint, plaintiffs allege that they sold Kirby products "below a normal price as suggested by Kirby" and "did not adhere to the requirements of a suggested retail price." (Am.Compl. para. VI). Plaintiffs allege that as a result of these activities their Distributor Agreement was terminated and Kirby similarly agreed with, threatened, or otherwise prevented other Kirby distributors from dealing with plaintiffs (*Id.*) None of these allegations state a claim under the former Texas Antitrust Statute for price fixing.

#### a. *Requirements About Price Advertising Do Not Violate Texas Antitrust Law*

■ First, Kirby's Distributor Agreement shows that Kirby did not require any retail price. Indeed, as discussed above, plaintiff Jerry Cranfill admitted that she could charge whatever price for Kirby products that she wanted to charge, and she did (Cranfill Depo. at 43–45). Mrs. Cranfill further admitted that she never filed any report with anyone at Kirby

which disclosed her prices to customers and that she had no recollection of ever telling anyone at Kirby what prices she charged (*Id.* at 41–42).

Mrs. Cranfill's testimony regarding alleged restrictions on price advertising in this case are very similar to the allegations raised as an affirmative defense by the defendant in *Sessions Company v. W.A. Sheaffer Pen Company,* 344 S.W.2d 180 (Tex.Civ.App.—Dallas 1962, writ ref'd n.r.e.). The defendant in *Sessions* claimed that its ability to price advertise was restricted and that it was terminated for not following such price restrictions. *Id.* at 184. The court noted:

In the instant case there is no showing that plaintiff furnished dealers with suggested prices or specified retail prices. The invoice delivering the merchandise contains specific provisions that the sale to the dealer is subject to no conditions except those on the face of the order ... Defendant alleged specifically that it did sell the merchandise at the prices of its own choosing. The allegations of defendant, being insufficient to state a claim under the Texas Antitrust Laws, the trial court did not err in granting summary judgment.

*Id.* at 183–84 (citations omitted). The court further stated that a seller may choose its customers, or refuse to sell, at its pleasure and without violating the former Texas antitrust statute. *Id.* at 184. Bare allegations regarding purported requirements to conform to certain prices do not preclude summary judgment where, as here, the record shows an actual course of conduct where the manufacturer did not specify prices for resale of its products and the distributorship set its own prices.

#### b. *Suggested Retail Prices Do Not Violate Texas Antitrust Laws*

■ Second, Kirby's advice regarding suggested retail prices does not mean that plaintiffs have a claim under the former state antitrust laws. As the court held in *Pram Laboratories, Inc. v. Pram Laboratories—South, Inc.,* 445 S.W.2d 533, 537 (Tex.Civ.App.—Dallas 1969), "Suggested

prices are not violative of antitrust statutes."

### 3. There Was No Actionable Refusal to Deal with Plaintiffs

#### a. *Kirby's Cancellation of Plaintiffs' Distributor Agreement Cannot Form the Basis of a Refusal to Deal Claim*

■ Plaintiffs, through the deposition testimony of Jerry Cranfill, admit that they submitted false sales reports to Kirby (Cranfill Depo. at 51–57). Submitting false sales reports is expressly provided in the Distributor Agreement as a reason for termination of the agreement (Herron at para. 11, Dist.Agmt. at para. 13). Plaintiffs' Distributor Agreement was cancelled for this reason and for this reason alone (Herron at para. 17).

It is beyond dispute that a manufacturer can deal or refuse to deal with whomever the manufacturer wants without incurring antitrust liability. *Ford Motor Co. v. State*, 142 Tex. 5, 175 S.W.2d 230, 234 (1943); *Erickson v. Times Herald Printing Co.*, 271 S.W.2d 329, 332 (Tex.Civ. App.—Dallas 1954, writ ref'd n.r.e.) ("a manufacturer may sell or refuse to sell to any person at his pleasure ..."). Accordingly, unilateral termination of a distributorship contract pursuant to its terms cannot subject a manufacturer to antitrust liability. *Ford Motor Co. v. State*, 142 Tex. 5, 175 S.W.2d at 234; *Erickson v. Times Herald Printing Co.*, 271 S.W.2d at 330–32; *Red Wing Shoe Co. v. Shearer's, Inc.*, 769 S.W.2d 339, 345 (Tex.Civ.App.—Houston [1st Dist.] 1989) ("Texas courts have long recognized the right of a manufacturer unilaterally to discontinue a sales relationship with a customer") (applying principles of the pre–1983 Act to the 1983 Act).

■ Nor does Kirby's practice of including reporting requirements and enforcing same implicate the pre–1983 Texas antitrust laws. A manufacturer may impose a number of conditions on its dealers without violating the antitrust laws. As the Supreme Court of Texas observed:

> There is nothing in such [antitrust] laws that requires a manufacturer to sell its manufactured product to any dealer or purchaser who wishes to buy same. To the contrary, such manufacturer may sell, or refuse to sell, at its pleasure. In electing to sell to a particular dealer, a manufacturer may lawfully require that such dealer maintain proper facilities and labor to furnish proper service to the users of its manufactured product. This is a right of general interest to the manufacturer, to the dealer, and to the general public.

*Ford Motor Co. v. State*, 175 S.W.2d at 234.

In that case, Ford also had reporting requirements, which the Supreme Court felt raised some questions. Kirby's reporting requirements, however, are much less strenuous than those of the defendant in *Ford Motor Co.* There, the Ford dealer had to submit reports and submit to inspections of records which included price information. *Id.* at 234. Kirby, on the other hand, neither asked for nor received *any* retail price information in the records that its distributors were required to submit, as plaintiff Jerry Cranfill admitted under oath (Cranfill Depo. at 41–42).

#### b. *Kirby Did Not Enter into a Combination, Conspiracy or Trust with Other Distributors Not to Deal with Plaintiffs*

■ The final remaining basis for plaintiffs' antitrust claims is the allegation that plaintiffs were unable to deal with other Kirby distributors because Kirby threatened, fired or otherwise agreed with these distributors such that they would not deal with Mrs. Cranfill.

As Irene Sperry described this conduct, Kirby told its distributors, "Kirby expected [the Cranfills] to stay terminated...." (Affidavit of Irene Sperry, para. 5). Even if Kirby did act as alleged, plaintiffs would have failed to state a claim under the pre–1983 Texas Antitrust Statute. As previously discussed, the Supreme Court of Texas has said, "There is nothing in such [antitrust] laws that requires a manufacturer to sell its ... product to any dealer or purchaser who wishes to buy same." *Ford Motor Co.*, 175 S.W.2d at 234. Plaintiffs

cannot force Kirby to do business with them.

### COUNT VII

Plaintiffs' claim on Count VII alleges that Kirby tortiously interfered with plaintiffs' contractual and business relations. Apparently this claim relates to the dealer agreements plaintiffs allegedly entered into with other Kirby distributors. Plaintiffs allege that Kirby "pressured, coerced, threatened, and actually fired" the distributors with whom plaintiffs had entered into dealer agreements (Am.Compl. para. V). There is a genuine issue of fact raised regarding the Cranfills' contracts with Irene Sperry, Roy Baker, and Ted Fite. Accordingly, summary judgment on Count VII is DENIED.

### CONCLUSION

For the foregoing reasons, summary judgment for the defendants is GRANTED as to Counts I, II, III, IV, V, and VI, and DENIED as to Count VII.